PEOPLE v. GOTSHALL.

1. CRIMINAL LAW—ARSON—EVIDENCE.
Evidence reviewed, and *held* to be sufficient to support a conviction of arson.

2. SAME—IDENTIFICATION.
In the absence of evidence that accused, charged with arson, was of uncommon height or figure, it was error to admit as affirmative evidence of identification that witnesses met a man in a public highway, in the evening, shortly after the fire, and from one to two miles from the building burned, of about the same size and height as the accused.

3. SAME.
In a prosecution for arson, it was error to allow two active young men to testify for the people that they had started from the point where accused was claimed to have been seen the night of the fire, and had walked in a given space of time to the burned building and back to accused's home, over the same course he was claimed to have taken, for the purpose of convincing the jury that accused, a man 70 years old, and in ill health, could have made the trip in nearly the same time.

4. SAME—TRIAL—IMPARTIAL CONDUCT.
Where the respondent in a criminal prosecution is unpopular in the community where the trial is had and the crime with

which he is charged was committed, and there is great feeling and prejudice against him, the prosecuting attorney and circuit judge are under especial responsibility to conduct his trial with fairness and impartiality.

5. SAME—MISCONDUCT OF PROSECUTOR—ATTACK ON RESPONDENT'S WITNESSES.

It was reversible error for the prosecuting attorney to make unwarranted attacks upon respondent's witnesses, calculated to arouse in the jury an unjust suspicion of their character and truthfulness.

6. SAME.

It was error for the prosecuting attorney to make the statement, when a witness failed to appear, that he did not know who was "dragging away" the witnesses; it being in effect an insinuation that respondent was trying to keep the witnesses from attendance, for which charge there was no foundation.

7. SAME—CROSS-EXAMINATION.

Where accused was charged with arson, it was error to allow the prosecution to ask him, on cross-examination, if he had not set numerous other fires, for the mere purpose of conveying the impression to the jury that the prosecution believed that he had set them, without expectation that accused would give an affirmative answer.

8. SAME—PRIOR OFFENSES.

Where accused was charged with arson, it was error to allow the prosecution to ask him, on cross-examination, whether he had not been threatened with arrest for setting fires in another State, where such questions related to matters occurring more than 32 years before the trial.

9. SAME—MOTIVE—WITNESSES—UNCERTAINTY.

On a prosecution for arson, the testimony of the owner of the building burned, introduced for the purpose of showing a motive for the crime, that he was of the impression that he had a conversation with respondent in regard to the insurance, but was not positive whether he had or not, should have been excluded, as not rising to the dignity of evidence.

Error to Genesee; Wisner, J.   Submitted February 1, 1900.   Decided March 27, 1900.

John H. Gotshall was convicted of arson, and sentenced to imprisonment in the State prison at Jackson for 10 years. Reversed.

Respondent, who is nearly 70 years of age, was convicted of the crime of arson, and sentenced to the penitentiary for 10 years. He had lived in the city and town of Flint for 32 years. He was a merchant. The property destroyed was a barn, its contents, and strawstacks around it, belonging to Lee & Aitken, lawyers, residing in the city of Flint. Respondent also resided in the city. His home was 2½ miles from the burned buildings, and his store 2 miles. The fire occurred September 30th, and was discovered about 7:30 p. m. An auction was held at the farm that day, the sale closing about 5 o'clock. The articles sold were across the road from the barn, and about 30 rods distant. Horses were tied around the barn, and people went in and around it during the day. The weather was hot, and it was very dry. Respondent was ill, and under the care of a physician, who advised him not to attend the sale. He, however, rode there with a neighbor, bought a few articles, and returned home about 5 o'clock. The property was insured in the Genesee Farmers' Mutual Fire Insurance Company, of which respondent had once been a member. He had difficulty with the company, withdrew from it, and litigation arose between them. In this litigation Mr. Lee was one of the attorneys for the company, and in his argument had severely criticised respondent. There was the usual amount of smoking by those attending the sale. There was testimony of threats made by the respondent against the company. The buildings were situated east of the city. The street—Kearsley street—by which they were reached was one of the principal thoroughfares leading in and out of the city.

*Geer & Williams*, for appellant.

*Fred W. Brennan*, Prosecuting Attorney, for the people.

GRANT, J. (*after stating the facts*). 1. It is the theory of the prosecution that respondent, after returning

from the sale, and after the hour of 6:30, walked to the barn, set fire to it, and returned to his home along the public highway and streets of the city. The claimed motive for the crime is his animosity against the insurance company and Mr. Lee. It is strenuously urged by counsel for respondent that the prosecution failed to establish the crime, and that the court should have directed an acquittal. The case for the prosecution rests entirely upon the testimony claimed to show that the respondent was seen going east on Kearsley street, towards the buildings, about 6:30, and about three blocks from Saginaw street, and that about the time the fire broke out he was seen going west on Kearsley street and on Court street, which runs parallel to Kearsley. The witness who testified to meeting him going east said: "It was not dark. It was between sundown and dark." The streets had not been lighted. The witness did not see his face, and could, therefore, only recognize him by his clothes. He does not, however, state by what means he recognized him other than to tell how he was dressed. He said his clothes were dark. He could not tell whether his coat was long or short. Didn't pay attention enough to know whether it was an overcoat or a sack coat. He further testified, "I have seen him wear the hat frequently." This is all the testimony the witness gave in support of his identification. The place where this witness testified to meeting respondent was at least two miles from the fire. Two other witnesses testified to meeting respondent on Court street, on the west side of Gilky creek, going west into the city, at a point nearly two miles from the fire. Their testimony as to the identification is not very satisfactory. The prosecution also gave testimony of a man coming west on Kearsley street near Gilky creek, who, it is claimed, was respondent. Two witnesses testified to meeting this man, and that he was about the same size as respondent. They saw the fire about the same time as did the witnesses who went out Court street, one of whom went on a bicycle. The witnesses on Kearsley street had

a horse and buggy. If the person seen on Kearsley street was the same man who was seen on Court street, he must have traveled that distance—nearly or quite 3,000 feet—in an almost incredibly short space of time. Although this testimony of identification is very unsatisfactory, we do not think that we can hold that there was no evidence for the jury to act upon. The verdict, however, based upon this testimony, leads to a careful examination of the errors assigned.

2. Several witnesses were permitted to testify that they met a man on Kearsley and Court streets, none of whom placed him within a mile of the fire, and that he was about the height and size of respondent. This was allowed to go to the jury as evidence that respondent was seen going towards this farm before the fire, and returning from it after, and thus justify the conclusion. that he set the fire. The value of such testimony will be seen from the cross-examination of one of the witnesses:

"*Q.* How did the man compare with your size?

"*A.* Just about my size.

"*Q.* How would he compare with Mr. Brennan as to size?

"*A.* I suppose pretty near the size.

"*Q.* You know 100 men about that size?

"*A.* Yes, sir.

"*Q.* So there was nothing uncommon about his size?

"*A.* Not particularly."

To casual observers, unless one is so much above or below the ordinary height or size of men as to attract attention, persons, when seen at dusk, or in the evening, or in the light of electric lamps, would appear about the same size and height. When there are hundreds of others in the same community of about the same height and size as the person upon trial charged with a heinous crime, it is not competent to introduce, as affirmative evidence of identification, testimony of witnesses that they met a man in the public highway, in the evening, from one to two miles from the *locus* of the crime, of about the same size and height as the respondent. Such testimony is merely

the•expression of an opinion based upon the most casual observation, and cannot be used to form one of the important and necessary links to convict a person of crime.

3. Two active young men, at the instance of the prosecution, started from a point in Kearsley street, where the witness testified he met respondent on the night of the fire, walked thence to the place of the fire, and back to respondent's home, and were allowed to testify that they made the trip in one hour and ten minutes. This was over the course it was claimed respondent took. This testimony was offered for the purpose of convincing the jury that respondent could have made this trip, entered and fired the barn, and returned home in the same time, or a few minutes longer. The injustice of this procedure is manifest. Had the prosecution selected two men of the age and condition of respondent, there would have been a show of propriety and fairness. There is no logic in the argument that, because these young men walked or ran from four to four and a half miles in an hour and ten minutes, therefore this old man, who was ill, accomplished the same feat.

4. Dr. Howland, a physician of 28 years' practice in Flint, testified that he had been treating respondent for a month or more for a trouble of the bladder; that he had treated him that morning before he went to the sale, giving him medicine, and washing out his bladder; that he had urged him not to attend the sale; that he was in the respondent's store that evening, when they were closing up, at 6 :25 or 6 :30 o'clock, and saw the respondent there; that within half an hour, or perhaps a little longer, thereafter, he saw the fire; and that, in his opinion, respondent was physically incapable of walking to the place of the fire and back within the time claimed by the prosecution. On cross-examination he was asked how many times he had been a witness for respondent, to which he replied, "Once." The prosecuting attorney then continued:

"*Q.* Is this the only case you have been a witness for him in?

"*A.* Yes, sir.

"*Q. Do you recollect the trial of the other case, in which he was charged with a fire over in Burton?* Were you not a witness for him then?

"*A.* No, sir."

A similar course of cross-examination was pursued with another witness for the respondent, named Kelley.

One Mrs. Sweet, a witness for respondent, was formerly a Mrs. Chase, residing in the State of New York. On cross-examination she testified that her husband got a divorce from her in New York. The prosecutor then asked her, "Don't you know that they cannot get a divorce in New York on any ground except adultery?" Objection to this question was sustained.

One Boomer was cross-examined by the prosecuting attorney as follows:

"*Q.* Did you ever attempt to hang yourself?

"*A.* No, sir.

"*Q.* And then didn't you go back in the house, and whip your wife, because she wouldn't cut you down?

"*A.* No, sir.

"*Q.* You never whipped your wife?

"*A.* No, sir.

"*Q.* You have never been threatened with arrest for beating your wife?

"*A.* No, sir.

"*Q.* Wasn't that canvassed at the time you were appointed night-watch on the street, and they didn't want to appoint you because you were a wife-beater?

"*A.* No, sir.

"*Q.* Do you swear that is true?

"*A.* I never heard of it before.

"*Q.* You never beat your wife, did you?

"*A.* No, sir.

"*Q.* You never did?

"*A.* No, sir.

"*Q.* Do you swear that they didn't talk about that, and raise that as an objection against you?

"*A.* I never heard it mentioned before."

We think the attempt to throw discredit upon these witnesses by the cross-examination was unjustifiable. It

is impossible to read this record without reaching the conclusion that the respondent was a very unpopular man, and that there was great feeling and prejudice in the community against him. Under these circumstances it was the special duty of the prosecuting attorney to see that the respondent had a fair trial, and not to introduce in evidence matters which would permit the jury to entertain an unjust suspicion of the character and truthfulness of the witnesses. It was, moreover, the duty of the judge to restrain these attacks. *Rickabus* v. *Gott,* 51 Mich. 227 (16 N. W. 384).

Another incident occurred in the course of the trial which illustrates the method pursued by the prosecution in order to cast suspicion upon the defense. One Miss Bumps, when called as a witness by the prosecuting attorney, did not respond, whereupon the assistant prosecuting attorney arose, and said, in the presence of the jury:

"I have been informed by the neighbors up there that Miss Bumps has not been seen by the neighbors today. She has been subpœnaed, and we have sent a hack after her. I do not know who it is that is dragging these witnesses away."

There was no foundation for any such statement. It amounted to a direct charge that the respondent was trying to obstruct the course of justice by keeping the witnesses for the prosecution from attendance.

5. The respondent was a witness in his own behalf. On his cross-examination the following questions were asked under objection and exception:

" *Q.* Where did you live previous to coming to Genesee county?

" *A.* Pennsylvania,—Oil City.

" *Q.* How long had you lived at Oil City before you came here?

" *A.* I don't just remember; say four years; possibly maybe five.

" *Q.* What was your business there?

" *A.* I was engaged as a merchant.

123 MICH.—31.

"*Q.* What business?

"*A.* As a merchant, wholesale and retail,—flour and feed, groceries and provisions, and crockery store. I had three stores at that time.

"*Q.* Why did you leave there and come to Michigan?

"*A.* Why?

"*Q.* Yes.

"*A.* I came to change away from Oil City, and I came here to buy a home in the country.

"*Q.* Why?

"*A.* I was tired of the country, and I had traveled south a thousand miles to find a home before I came here.

"*Q.* Were you threatened with arrest for any fires there at that time?

"*A.* No, sir.

"*Q.* You didn't leave there because of any fires?

"*A.* No, sir.

"*Q.* Had you a fire there?

"*A.* Not personally; only as the city burned up. On the 26th of May, 1866, we had a fire there that burned the city up.

"*Q.* Where did the fire start?

"*A.* In the old Widow Sullivan's shanty.

"*Q.* How far from your premises?

"*A.* I should say the distance was in the neighborhood of a quarter of a mile southeast, I think. * * *

"*Q.* Do you remember who was accused of starting that fire there at Oil City?

"*A.* We knew all about it. It was right in the daytime it commenced, and it commenced in the old Widow Sullivan's shanty, because of the use of petroleum.

"*Q.* Do you know who was accused of setting the fire at that time, just before you left there?

"*A.* No, sir; I never heard of anybody. I soon went back there. * * *

"*Q.* Now, you may state whether or not you were accused of burning the Nesbitt barn. Were you not accused of burning the Adams barn? Did you not burn Adams' barn? Did you not burn Nesbitt's barn? Did you not burn Dr. Miller's barn? Did you burn Damon Stewart's barn? Did you burn Pearson's barn? Did you burn Benson's barn, Mat Davison's barn, the Stockdale barn? These barns I have mentioned are all within a radius of how much from Flint?

"*A.* You know as well as I; not far from the city.

"*Q.* Within a radius of what distance?

"*A.* Within a radius of two miles, I think, would cover it.   I think one was three or four miles.   *   *   *

"*Q.* Have you heard of any great losses since your arrest in this case, except the Miller barn?

"*A.* Yes, sir; I think five or six, I was going to say, if I had time to look it up.

" *Q.* Since your arrest, except the Miller barn, will you tell me of another barn ?   *   *   *

"*Q.* Is it not barely possible that you are mistaken about some of these matters that you are so positive about?

"*A.* Possibly.

"*Q.* Is it not barely possible that you may have burned Miller's barn?

"*A.* No, sir."

In his argument to the jury the prosecuting attorney used the following language:

"He goes down the Richfield road.   Down where ?   To Dr. Miller's barn.   There he said he stopped, and went in that yard, and up to the barn, and that he called there for the purpose of looking at some sheep racks.   He would not be positive whether he went around into the barn or not; he would not be positive about that.   *I want you to recollect the fact that soon after that Dr. Miller's barn burned.*"

Other portions of the cross-examination are of a similar character: While it is the well-settled rule that the previous life and character of a witness may be inquired into to elicit facts which may aid the jury in determining what credence they will attach to his testimony, yet it is the duty of the courts to keep such examinations within reasonable bounds.   When it is manifest that the design or effect of the questions is not to elicit facts, but to cast suspicion upon the character and credibility of the witness, courts must intervene, or trials will result in a miscarriage of justice.   The prosecuting attorney had no expectation that the respondent would admit that he was guilty of arson in the several cases inquired about.   He had been arrested and tried in one of the cases, and acquitted.   The purpose of these questions is too manifest.   It was designed to convey to the jury the impression that the

prosecuting officer believed he was guilty of them. The books are full of cases condemning such practice. *Gale* v. *People*, 26 Mich. 157; *People* v. *Crapo*, 76 N. Y. 288 (32 Am. Rep. 302); *People* v. *Cahoon*, 88 Mich. 456 (50 N. W. 384); *Buel* v. *State*, 104 Wis. 132 (80 N. W. 78); *Elliott* v. *State*, 34 Neb. 48 (51 N. W. 315).

The inquiry into the fire at Oil City was too remote to be admissible, under the well-established rule. Greenleaf thus states the rule:

"The examination being governed and kept within bounds by the discretion of the judge, all inquiries into transactions of a remote date will, of course, be suppressed; for the interests of justice do not require that the errors of any man's life, long since repented of, and forgiven by the community, should be recalled to remembrance, and their memory perpetuated in judicial documents, at the pleasure of any future litigant. The State has a deep interest in the inducements to reformation held out by the protecting veil which is thus cast over the past offenses of the penitent." 1 Greenl. Ev. (15th Ed.) § 459.

The prosecuting attorney attempts to justify his cross-examination of the respondent in the following language:

"In view of the fact that there was the feeling against respondent among the people from his being connected with the many fires which had occurred, which was shown by the testimony of witnesses Creque and Willett, and which was admitted by respondent himself on cross-examination, it was in the discretion of the trial judge to permit the questions asked him on cross-examination."

If this be sound, it follows that the prosecution may show strong feeling in the community that a respondent is guilty of many crimes that have been committed, and thus justify asking him if he is not guilty of each and all; and this in the face of the fact that the prosecuting attorney has no expectation that he will admit his guilt. The statement of the prosecution is its own refutation.

6. In order to show a motive, Mr. Aitken was called to testify to a conversation with respondent with regard to the insurance upon this property: "*Q.* Did you have any

conversation with him with reference to this property? *A.* My impression is I did; still I would not be positive that such was the case." The prosecuting attorney then, for the purpose of refreshing the witness' recollection, called his attention to a conversation with respondent when Mr. Lee was present. The witness replied he did not recollect, and was not positive of any conversation at all with relation to the barn that was burned. Proof of a motive was very important. The mere impression of the witness that he had a conversation with respondent about changing his insurance from the old company to a new one does not rise to the dignity of evidence, especially in a criminal case. This testimony should have been excluded.

We are satisfied that the respondent did not have that fair and impartial trial which the Constitution and law of this State guarantee him. Conviction reversed, and new trial ordered.

The other Justices concurred.