## PEOPLE *v.* KAIGLER.

1. CRIMINAL LAW—MOTION TO SUPPRESS EVIDENCE.

   A motion to suppress evidence in a prosecution for crime must be determined upon the facts produced at the time of the hearing thereon, and cannot be amplified by testimony taken later at the trial.

2. SEARCHES AND SEIZURES—RESIDENCE.

   One's residence cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein (US Const, Am 4).

3. SAME—SUSPECTED.

   The right to freedom from searches and seizures without a search warrant extends to all equally, to those justly suspected or accused of crime, as well as to the innocent (US Const, Am 4).

4. SAME—UXORICIDE—TAPE RECORDER.

   A search of the residence of man held for uxoricide some 8 hours after he had been taken therefrom by the police and their seizure of a tape recorder and tape without a search warrant was not a reasonable search and seizure (US Const, Am 4).

5. SAME—WAIVER—CONSENT—COERCION—BURDEN OF PROOF.

   The obtaining of a search warrant may be waived by an individual and he may give his consent to search and seizure, but such waiver or consent must be proved by clear and positive testimony and be shown to have been made without duress or coercion, actual or implied, and the prosecutor must show a consent that is unequivocal and specific, freely and intelligently given, a burden that is particularly heavy when the individual is under arrest (US Const, Am 4).

REFERENCES FOR POINTS IN HEADNOTES

[1, 11]  20 Am Jur, Evidence § 396.
[2, 3, 9]  47 Am Jur, Search and Seizure § 16.
[4, 10]  47 Am Jur, Search and Seizure §§ 52, 54.
[5, 6]  47 Am Jur, Search and Seizure § 71.
[7, 8]  11 Am Jur, Constitutional Law §§ 59, 60.
   47 Am Jur, Search and Seizure §§ 9, 10.

6. SAME—CONSENT—COERCION.

The consent of defendant, held for uxoricide, to search his premises may not be said to have been free from duress and coercion, where he was told by an officer that the premises would be searched even if he did not give up the key some 8 hours after he had been taken away (US Const, Am 4).

7. SAME—CONSTRUCTION OF CONSTITUTION.

The amendment to the Constitution of the United States prohibiting unreasonable searches and seizures is to be construed liberally to safeguard the right of privacy and all owe a duty of vigilance for its effective enforcement (US Const, Am 4).

8. SAME—CIVIL LIBERTIES.

The difference between demanding documents without legal process and seizing them on the basis of such process, is the difference between the protection of civil liberties and their invasion, the difference being the essence of the provision of the Constitution protecting against unreasonable searches and seizures (US Const, Am 4).

9. SAME—UXORICIDE—EVIDENCE.

Evidence, presented at preliminary examination of defendant accused of uxoricide *held*, insufficient to justify or warrant the search of defendant's premises some 8 hours following his removal therefrom by policemen (US Const, Am 4).

10. HOMICIDE—EVIDENCE—SEARCHES AND SEIZURES—WAIVER—CONSTRUCTIVE POSSESSION.

Admissibility of tape recorder and tapes, taken from defendant's premises by police officers some 8 hours after they had removed him therefrom shortly after his alleged commission of uxoricide, may not be justified either on theory of his waiver of his constitutional right to protection from unreasonable search and seizure nor because of asserted constructive possession of the premises by the police, under record presented (US Const, Am 4).

11. SAME—ILLEGAL SEARCH AND SEIZURE—TAPE RECORDER AND TAPE—MOTION TO SUPPRESS.

Admission in evidence of tape recorder and tape at trial of defendant, charged with uxoricide, was reversible error, where such evidence had been taken as the result of an illegal search and seizure some 8 hours after he had been removed from the premises and he is not shown to have consented to such search freely and without coercion, a motion to suppress such evidence having been timely made (US Const, Am 4).

Appeal from Recorder's Court of Detroit; O'Hara (John P.), J.  Submitted January 11, 1962.  (Docket No. 82, Calendar No. 49,040.)  Decided December 3, 1962.

Elzie Kaigler was convicted of first-degree murder.  Reversed and new trial granted.

*Frank J. Kelley,* Attorney General, *Joseph B. Bilitzke,* Solicitor General, *Samuel H. Olsen,* Prosecuting Attorney, *Samuel J. Torina* and *Angelo A. Pentolino,* Assistant Prosecuting Attorneys, for the people.

*Dobreff, Collins & Silverman (Edward Dobreff* and *Morton H. Collins,* of counsel), *Seymour F. Posner* and *Norman L. Zemke,* for defendant.

KAVANAGH, J.  Defendant was convicted by a jury in recorder's court of the city of Detroit of the first-degree murder* of his wife, Clara Kaigler.  He was sentenced to life imprisonment and, on denial by the trial court of a motion for a new trial, which included the court's failure to grant defendant's motion to suppress, is here on leave granted.

The facts surrounding the shooting are as follows: During the course of the evening of January 13, 1959, defendant's daughter had played the piano for her mother; apparently the mother had used a tape recorder which she had acquired the previous Christmas to record the piano playing.  After an evening spent with the children and watching television, the defendant and his wife were alone in the living room. The parties had at least 1 drink of rum and Coca-Cola.  An argument developed concerning a proposed trip by defendant to a convention in Hot

---

* See CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548).—REPORTER.

Springs, Arkansas. The argument grew out of a letter and some tickets to an event at the convention which the defendant had received from a woman. The argument continued through the course of the evening, during which they intermittently watched television, ending with the sports news at 11:20. Defendant testified in his own behalf that he went to bed after the newscast, leaving his wife sitting in the living room finishing her drink.

It appears there was no physical contact between the defendant and his wife up to the point when he went to bed, at which time he contends the argument was over. Defendant went to sleep but later was awakened by his wife's presence in his room. He did not know the time but it was at least 35 to 40 minutes before the shooting.

According to defendant, when he awoke his wife was standing in the bedroom between him and the hallway. The first thing his wife said was, "You're not going to Hot Springs." She dared the defendant to get up, but he just sat "on his elbows." Defendant testified he protested he went to Hot Springs every year and was expected there, whereupon his wife flew into a rage of abusive and obscene language. Defendant listened and finally responded. His wife carried on for 20 to 25 minutes.

Defendant got out of bed for the purpose of going to the bathroom. His wife blocked his path and a scuffle ensued. Defendant testified his wife was trying to choke him and he bit her on the arm. The wife then bit the defendant. They wrestled to the floor. Defendant got up and left the room and went into the den. His wife followed him. Defendant got his gun from the desk drawer and when his wife hit him with a stick, defendant fired the gun once to show her it was loaded, and later hit her with the barrel of the gun. Mrs. Kaigler wrestled with defendant, trying to get control of the gun. Defendant

testified that eventually as he went down on his right side Mrs. Kaigler was just above him; that they had gone almost to the floor when he heard the gun go off; that she fell right across his lap, the blood gushing.

The children came downstairs after the shots, and defendant told his oldest daughter Rose to telephone the police. The time was about 1:15 a.m., January 14, 1959. The first officer reached the scene at about 1:25 a.m. The officers found the body of defendant's wife on the floor of the bedroom. Near her body on the floor was a tape recorder and a microphone. On top of the recorder the tape itself was partly pulled off the spools and jumbled up. Blood from the deceased was on the tape and the recorder. The recorder's indicator light was flashing off and on. The spools were jammed. Under instructions by telephone from the homicide bureau, the officer disconnected the electrical plug from the outlet. The body of the deceased was removed and the defendant was taken to police headquarters. The 4 children were also taken to police headquarters. When the officers departed, the front door of the home was pulled shut and locked.

Defendant was taken to the homicide bureau at police headquarters, where he was interrogated beginning at about 2:20 a.m. After questioning, defendant was taken to the prosecutor's office, where he made a formal statement in the presence of a reporter. Defendant was again questioned at 9 a.m. Later in the morning, Detective Backman, who had been assigned to the case, wanted to go to the scene of the killing. He examined the property of defendant to see if the keys to the home were among his effects, but did not find them. He checked with the women's division in charge of the children, and found they had no keys. Backman testified he sent his partner, Sergeant Harris, to have a conversation

with the attorneys for the defendant, following which the detective and the sergeant went to defendant's home. Sergeant Harris testified he received permission from one of the attorneys to go into the home of defendant.

After Backman and Harris entered the home, photographs were taken. They also opened, read, and took from the premises the letter which defendant had received relative to his trip to Hot Springs, Arkansas. They took the sheet and mattress cover from the bed of Mrs. Kaigler, a pair of men's pajamas from the bedroom of defendant, and the tape recorder as well as 2 spools which had been left in the house.

The tape recorder and the 2 spools, which were taken by the officers on January 14, 1959, were turned over to the scientific bureau to be cleaned because they were covered with a large amount of blood. At the trial Detective Backman identified the tape recorder as the one upon which he had put his initials at the scene of the crime. The tape recorder was almost completely covered with blood which had apparently seeped down through the machine and out the bottom.

Defendant was arraigned on a first-degree murder warrant and examination was held.

Subsequently, defendant filed a motion to suppress evidence as well as to produce evidence. The evidence he desired to have suppressed was the tape recorder, the tape, copies of recordings made therefrom, and other evidence seized. Defendant alleged the officers seized the evidence without a search warrant; that the seizure did not take place contemporaneously with the arrest of defendant; that it was not made with the consent or permission of defendant; that said evidence is neither an instrument of the crime charged nor a fruit of the crime and,

therefore, cannot be used as evidence against the defendant.

Defendant further contends the tape recording which the prosecutor proposed to use falls within the protection of the privilege of marital communications, which the defendant did not waive; that the prosecutor is unable as a matter of fact to lay a proper foundation for said tape recording in that he cannot produce the operator thereof for cross-examination; that said recording. is hearsay and is not, nor is the conversation contained thereon, a part of the *res gestae.* Defendant asserts an intervening period and a change in circumstances of the parties took place between what was instrumentally recorded and the actual shooting. It is alleged further that the purpose of using the recording was to ridicule, condemn, embarrass, and humiliate the defendant, a minister of the gospel.

The motion to suppress was denied by Judge George Murphy without recorded opinion on June 3, 1959.

At the commencement of the trial, the defense renewed its motion to suppress evidence, which was again denied by the trial judge.

The jury returned a verdict of guilty of murder in the first degree. A mandatory life sentence was imposed.

The motion for new trial was filed, including again the motion to suppress. The trial judge entered an order on February 8, 1960, denying the motion for new trial. Defendant is here on leave granted.

The controlling question in this case is: Did the lower court commit reversible error in failing to grant defendant's motion to suppress evidence, namely, the tape recording, for the reason the recording was the product of an unlawful search and seizure contrary to the Michigan Constitution of

1908, art 2, § 10, and the Fourth Amendment to the Constitution of the United States?

Since a motion for the suppression of evidence must be determined upon the facts produced at the time of hearing, and cannot be amplified by testimony taken later at the trial (see 1 Gillespie, Michigan Criminal Law & Procedure, § 718, pp 867–869; *People* v. *Kerwin,* 234 Mich 686; *People* v. *Willis,* 243 Mich 164; *People* v. *Miller,* 245 Mich 115; *People* v. *Kramer,* 260 Mich 94; *People* v. *Zeigler,* 358 Mich 355; *People* v. *Williams,* 368 Mich 494), it becomes necessary for us to determine what the actual facts and circumstances were at the time the motion to suppress was made.

It was the position of the defendant in his motion to suppress that on the morning of the alleged crime, sometime after 9 a.m., the police returned to defendant's residence and removed therefrom the tape recording and recording machine; that the police had no warrant; that they had no legal right to enter and search the premises in such a manner.

The prosecution, however, argued: (1) that they were actually in constructive possession of the premises since the police department had locked the door at 1:30 a.m., the morning of January 14th; (2) that they had the permission of defendant, through his attorney, one Mr. Massey, to search the premises.

The prosecution contends that since the defendant's premises were under "constructive custody" of the police, they were entitled to return later to search and seize any available evidence. Plaintiff admits the police did not have the keys to defendant's home and found it necessary to request them from the defendant, yet they contend the premises were in their "possession."

Plaintiff cites no authority for their theory as to "constructive possession" of the premises, and we find none. It is clear that the Fourth Amendment

to the Federal Constitution was specifically designed to prohibit such seizure where there is no court order or warrant. Justice Frankfurter has traced the history of the Fourth Amendment in his dissenting opinion in *Davis* v. *United States,* 328 US 582 (66 S Ct 1256, 90 L ed 1453), and clearly states its limitations in the following language (pp 604, 605) :

"So basic to liberty is the protection against governmental search and seizure, that every State in the Union has this ·as a constitutional safeguard. \* \* \*

"Mention has been made of the doubt in the minds of English and Colonial libertarians whether searches and seizures could be sanctioned even by search warrants. It is significant that Madison deemed it necessary to put into the Fourth Amendment a qualifying permission for search and seizure by the judicial process of the search warrant—a search warrant exacting in its foundation and limited in scope. This qualification gives the key to what the framers had in mind by prohibiting 'unreasonable' searches and seizures. *The principle was that all seizures without judicial authority were deemed 'unreasonable.' "*  (Emphasis supplied.)·

In *Agnello* v. *United States,* 269 US 20 (46 S Ct 4, 70 L ed 145, 51 ALR 409), Justice Butler said (pp 32, 33) :

"While the question has never been directly decided by this court, it has always been assumed that one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein. (Citing cases.) The protection of the Fourth Amendment extends to all equally,—to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws. \* \* \* Save in certain cases as incident to arrest, there is no sanction in the decisions of the courts, Federal or State, for the search of a private

dwelling house without a warrant. Absence of any judicial approval is persuasive authority that it is unlawful. See *Entick* v. *Carrington,* 19 Howell, English State Trials, 1029, 1066.* Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause. (Citing cases.)"

It appears that when the trial court used the term "constructively in possession" it possibly had in mind the decisions where things openly displayed were picked up by the officer and taken away at the time the arrest was made. Ordinarily, these decisions are based upon the theory that an officer, on seeing a felony committed or having probable cause to believe a felony was committed, may search the immediate premises for fruits of the crime or implements used in connection with the crime. Under those circumstances (unlike this case), it is argued the incidental search, made contemporaneously with the arrest, is lawful.

In *United States* v. *Lefkowitz,* 285 US 452 (52 S Ct 420, 76 L ed 877, 82 ALR 775), Justice Butler wrote for the United States supreme court as follows (pp 464–466):

"The Fourth Amendment forbids every search that is unreasonable and is construed liberally to safeguard the right of privacy. *Byars* v. *United States,* 273 US 28, 32 (47 S Ct 248, 71 L ed 520). Its protection extends to offenders as well as to the law abiding. *Weeks* v. *United States,* 232 US 383 (34 S Ct 341, 58 L ed 652); *Agnello* v. *United States,* 269 US 20, 32 (46 S Ct 4, 70 L ed 145, 51 ALR 409). The authority of officers to search one's house or place of business contemporaneously with his lawful arrest therein upon a valid warrant of arrest cer-

---

* 2 Wils K B 275, 95 Eng Rep 807.—REPORTER.

tainly is not greater than that conferred by a search warrant issued upon adequate proof and sufficiently describing the premises and the things sought to be obtained. Indeed, the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests. *  *  *

"The decisions of this court distinguish searches of one's house, office, papers or effects merely to get evidence to convict him of crime, from searches such as those made to find stolen goods for return to the owner, to take property that has been forfeited to the government, to discover property concealed to avoid payment of duties for which it is liable, and from searches such as those made for the seizure of counterfeit coins, burglars' tools, gambling paraphernalia and illicit liquor in order to prevent the commission of crime. (Citing cases.)

"In *Entick* v. *Carrington*, 19 Howell, English State Trials 1029, Lord Camden declared that one's papers are his dearest property, showed that the law of England did not authorize a search of private papers to help forward conviction even in cases of most atrocious crime, and said (p 1073): 'Whether this proceedeth from the gentleness of the law toward criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say. It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle. There too the innocent would be confounded with the guilty.'

"The teachings of that great case were cherished by our statesmen when the Constitution was adopted. In *Boyd* v. *United States*, 116 US 616, 630 (6 S Ct 524, 29 L ed 746), this Court said: 'The principles

laid down in this opinion (*Entick* v. *Carrington*) affect the very essence of constitutional liberty and security. * * * They apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. * * * A forcible and compulsory extraction of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods is within the condemnation of that judgment.' "

In the light of the constitutional safeguards existing under the Fourth Amendment, and in view of the time which elapsed between the closing of the home and the return of different officers the next day, and further considering the expressed statement of the officers that they intended to continue their investigation regardless of whether they were given permission, no argument on behalf of search and seizure contemporaneous with arrest could be made in the instant case.

We now discuss the plaintiff's contention that defendant consented to the search and seizure the morning after the shooting. It is admitted the police had no warrant. We are unable to learn from the record what reasoning Judge George Murphy followed in denying the motion to suppress, since the motion was denied without oral or written opinion.

In view of the rule that a motion for suppression of evidence must be determined from the facts produced at the time of the hearing, and cannot be amplified by testimony taken later at trial, it becomes incumbent upon this Court to ascertain from the record before Judge Murphy whether the police had actually received permission from the defendant to search his home and seize whatever evidence was available.

The affidavit attached in support of the motion to suppress by defendant stated as follows:

"That at no time did the deponent give said officers or officer permission to seize, take or use said articles and especially the tape recorder and tape; that notwithstanding, said police and the prosecutor of Wayne county propose to use the recorded voices on said tape in evidence against this deponent, contrary to all the guarantees of the Constitutions of the United States and Michigan and the statutes of the said State of Michigan; that said officers had no search warrant."

The prosecuting attorney of Wayne county in his "brief in opposition to defendant's motion to suppress evidence" stated as follows:

"The same morning, when Detective Melvin Backman and Detective-Sergeant David Harris were assigned by their superior, Inspector Richard H. Miller, as the officers in charge of the investigation of this matter, sometime later, around 8 o'clock in the morning, after familiarizing themeslves with the case, these officers inspected the articles which the defendant had in his possession when he was brought to the homicide bureau at police headquarters, and found no keys of any kind were obtained at the time of his arrest. They did this because they were going to visit the scene and conduct an investigation based upon findings of the officers on night duty. In the meantime, these officers engaged another member of the police force from what is known as the 'central photo bureau', Laurence Dokendorf, to meet them at the scene, 4492 Burns.

"During this time Attorney Lawrence Massey, who represented himself as defendant's counsel, appeared at the homicide bureau and talked to Detective Melvin Backman, and Detective-Sergeant David Harris, in which conversation the officers told counsel they did not find any keys in defendant's property, and were anxious to enter the home without creating damage and leaving the premises exposed to any prowler, but were going to continue the investigation of the crime whether or not they had

keys. Counsel Massey told these officers he would confer with his client, kept in custody on the ninth floor of the police headquarters building. He left. He returned a short time later and related to the same 2 officers that they had his client's permission to enter the premises in any way they could, including the breaking of a door or window of the house.

"After this the officers went to the scene of the crime where they met Officer Dokendorf. On examining the home they discovered that a dining room window was open. They hoisted Patrolman Dokendorf up to this window which he raised, and entered into defendant's home. He then opened the front door to permit Detective Melvin Backman and Detective-Sergeant Harris into the home. Inside the home, the officers thoroughly searched the rooms, had discovered certain other physical evidence, and after directing what photographs they wanted taken of the scene, confiscated the sound recording machine, as they found it well inside the bedroom of deceased, together with the plastic tape-like material wound around 2 plastic spools on the device. This consisted of the articles sought to be suppressed by defendant."

It is elementary that the obtaining of a search warrant may be waived by an individual and he may give his consent to search and seizure; but such waiver or consent must be proved by clear and positive testimony *and there must be no duress or coercion, actual or implied, and the prosecutor must show a consent that is unequivocal and specific, freely and intelligently given. Karwicki* v. *United States* (CCA 4), 55 F2d 225; *Kovach* v. *United States* (CCA 6), 53 F2d 639. *The burden for the prosecution is particularly heavy where the individual is under arrest. Judd* v. *United States,* 89 App DC 64 (190 F2d 649); *Amos* v. *United States,* 255 US 313 (41 S Ct 266, 65 L ed 654).

In reviewing the record set forth above, we find that Detective Harris, in seeking permission to enter defendant's home, expressly stated to defendant's attorney that the police were going to continue the investigation of the crime *whether or not defendant gave them the keys to his home.*

The defendant argued in his motion that at no time did he give permission to seize or use the tape recorder or other articles.

What constitutes waiver or consent under the Fourth Amendment is determined by the particular circumstances in each case. The relative credibility of the witnesses is not the central issue, but rather whether the evidence offered by the government meets the required standard. See *Judd* v. *United States, supra,* and cases cited therein.

In view of Detective Harris' statement that defendant's home was going to be searched even if defendant did not give the keys to the police, it cannot be said that defendant consented free from duress and coercion.

The Court in *Judd* v. *United States, supra,* where the defendant told police officers they could go out and see his place—that he didn't have anything to hide—held such statement did not amount to a waiver and commented as follows (p 651):

"Nonresistance to the orders or suggestions of the police is not infrequent in such a situation; true consent, free of fear or pressure, is not so readily to be found. (Citing cases.) In fact, the circumstances of the defendant's plight may be such as to make any claim of actual consent 'not in accordance with human experience', and explainable only on the basis of 'physical or moral compulsion'. *Ray* v. *United States* (CCA 5), 84 F2d 654, 656."

Before a court holds that a defendant waived his protection under the Fourth Amendment "there must be convincing evidence to that effect." *Nueslein*

v. *District of Columbia,* 73 App DC 85, 89 (115 F2d 690, 694). In reviewing the evidence of waiver presented, we must hold there has not been a sufficient showing of true consent, given intelligently and freely.

It is interesting to note that the police had ample time to swear out a valid search warrant, yet failed to do so. Since the Fourth Amendment requires that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized," we are inclined to believe the police attempted to accomplish a search and seizure through a doubtful consent of the defendant, which seizure could not be made even if they had a warrant.

In *Go-Bart Importing Co.* v. *United States,* 282 US 344, 357 (51 S Ct 153, 75 L ed 374), Justice Butler commented on just such a general search as follows:

"Since before the creation of our government, such searches have been deemed obnoxious to fundamental principles of liberty. They are denounced in the constitutions or statutes of every State in the Union. *Agnello* v. *United States,* 269 US 20, 33 (46 S Ct 4, 70 L ed 145, 51 ALR 409). The need of protection against them is attested alike by history and present conditions. The amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted. *Boyd* v. *United States,* 116 US 616, 623 (6 S Ct 524, 29 L ed 746); *Weeks* v. *United States,* 232 US 383, 389–392 (34 S Ct 341, 58 L ed 652)."

In *Davis* v. *United States, supra,* Justice Frankfurter made the following statement (p 603):

"The difference between demanding documents without legal process and seizing them on the basis

of such process, is the difference between the protection of civil liberties and their invasion. The difference is the essence of the Fourth Amendment."

We need not further review here the many United States supreme court cases on search and seizure, but cite the following: *Gouled* v. *United States,* 255 US 298 (41 S Ct 261, 65 L ed 647) ; *Kremen* v. *United States,* 353 US 346 (77 S Ct 828, 1 L ed 2d 876) ; *United States* v. *Lefkowitz,* 285 US 452 (52 S Ct 420, 76 L ed 877, 82 ALR 775) ; *Agnello* v. *United States,* 269 US 20 (46 S Ct 4, 70 L ed 145, 51 ALR 409) ; *Johnson* v. *United States,* 333 US 10 (68 S Ct 367, 92 L ed 436) ; *Go-Bart Importing Co.* v. *United States,* 282 US 344 (51 S Ct 153, 75 L ed 374) ; *Amos* v. *United States,* 255 US 313 (41 S Ct 266, 65 L ed 654).

Timely motion to suppress the evidence was made at the conclusion of the preliminary examination, and denied on the basis of the record at that time. No testimony was taken on the motion to suppress. The motion was renewed by the defense prior to trial, and denied.

In *People* v. *Zeigler,* 358 Mich 355, Justice DETHMERS, writing for the Court, said (p 359):

"What about probable cause in the case at bar? The only showing before the circuit court on the motion to suppress consisted of the testimony presented at the preliminary examination. Amplifying testimony later taken at trial cannot be considered. We are limited to that taken at the examination. *People* v. *Miller, supra."*

In *People* v. *Miller,* 245 Mich 115, this Court said (pp 116, 117):

"By objections to admission of testimony on the preliminary examination before the magistrate, by motion in the circuit court to dismiss the cause for the reason that there had been no competent testi-

mony produced at the examination to justify his being held for trial, and by motion to suppress the evidence so obtained by the officer, he properly challenged the validity of the search. This presents the only question in the case.

"The testimony taken at the examination constituted the whole showing on the motion to suppress. The determination of the motions to dismiss and to suppress rests upon such showing. Testimony later taken on the trial, amplifying the circumstances of the search, cannot be considered."

In *People* v. *Willis,* 243 Mich 164, the following appears (p 166):

"The record does not permit consideration of the other grounds assigned in the motion to suppress. The motion was not supported by affidavits, no testimony was presented on the hearing on the motion and the facts applying to the grounds relied upon for suppression of evidence are not shown upon the complaint and warrant or return. It is true that the whole matter of the search and its regularity was inquired into on the trial. But such evidence cannot be considered in support of the motion to suppress. With patient but progressive vigor this Court has continued to outline the practice, in the late case of *People* v. *Kerwin,* 234 Mich 686, 688, endeavoring to make it even more emphatic in the following language:

" 'It appears, however, that on the trial the legality of the search was again gone into. This should not have been permitted. When the motion to suppress was denied, the prosecution was entitled to offer the liquor in evidence, and the jury were in no way concerned with the manner in which it had been secured.' "

To the same effect is *People* v. *Kramer,* 260 Mich 94.

Examination of the record made at the preliminary examination in the case before us indicates that no

evidence was introduced by the prosecution that justified and warranted the search.

It is interesting to note that the people predicate their claim of admissibility of the questioned evidence upon defendant's alleged waiver of constitutional rights and constructive possession theory and not at all upon the grounds there had been a valid search and seizure. They attempt to justify their position solely by testimony taken subsequent to the motion to suppress the evidence during the trial of the cause itself. This they cannot do.

Both Justice KELLY and Justice SOURIS have ignored the long line of Michigan cases which hold that testimony taken at the trial cannot be considered as bearing on the question of the validity of the search and seizure; but only the testimony at the examination and at the hearing on the motion to suppress before trial can be considered in determining whether the search and seizure were valid. In total disregard of this long line of decisions, they have proceeded to give consideration to trial testimony without indicating whether they would overrule this well-settled law of this State. With this method of disposition, I cannot agree.

The prosecution did not meet the standard of proof necessary to justify the search and seizure made by the police on the morning following the shooting. The evidence wrongfully acquired must be suppressed. See *People* v. *Miller,* and other cases cited, *supra.*

The tape recorder and the tape were taken as the result of an illegal search and seizure and must not be admitted at trial. *Mapp* v. *Ohio,* 367 US 643 (81 S Ct 1684, 6 L ed 2d 1081).

In view of the fact a new trial will result, we find it unnecessary to discuss the other assignments of error.

. The order denying the motion to suppress the evidence (the tape recorder and tape found thereon and copies. of the recording made therefrom) is reversed; an order granting the motion to suppress the evidence shall be entered in accordance with this opinion; and a new trial is granted.

CARR, C. J., and DETHMERS, and BLACK, JJ., concurred with KAVANAGH, J.

KELLY, J. (*concurring*). The record does not disclose that Recorder's Court Judge George Murphy committed error in denying defendant's motion to suppress or that the trial judge, Recorder's Court Judge John P. O'Hara, erred in finding, in his opinion on motion for new trial, that:

"In view of the permission given by the defendant with his attorney's approval, the entry could not have been illegal or unreasonable. In searching as they did the police were performing their duty at the scene of the crime. * * * The consent and advice of defendant removed any objections, if any is valid, to the return of the police later in the day to continue their investigation."

Justice KAVANAGH's conclusion is based on a purported statement of the prosecuting attorney in his brief opposing defendant's motion to suppress, before Judge Murphy, that Detective-Sergeant Harris informed defendant his home would be searched even though he did not grant them permission and give them the key. It is admitted that the record does not disclose that such a statement was made at the hearing before Judge Murphy, or was even considered by him.

Defendant's attorney cross-examined Sergeant Harris at the trial and at no time, intimated that defendant gave permission because of coercion. or

referred (then or at any time in defendant's brief) to the statement contained in the prosecuting attorney's brief, namely that the police "were going to continue the investigation of the crime whether or not they had keys."

Defendant in his testimony makes no reference to this point and admits giving Sergeant Harris permission to enter his home, as is shown by the following:

"*Q.* Reverend Kaigler, I direct your attention to the morning of January 14, 1959, when you were under arrest and on the 9th floor of police headquarters and to a conversation which you had with Detective-Sergeant David Harris concerning going out to your house. Would you repeat that conversation the best you can?   *   *   *

"*A.* He said they wanted to go out and make some pictures, wanted to know how to get into the house. I told them I didn't have a key, but I thought the kitchen—the window on the south side of the house was unlocked, perhaps they could get in that way."

Not only the lack of reference by defendant to the prosecuting attorney's statement, but the testimony of Sergeant Harris at the trial also refutes a conclusion that we should declare an illegal search because the prosecutor in his brief indicated defendant's home was going to be searched even if defendant did not give the keys to the police, as is evidenced by the following excerpts from Detective Harris' testimony at the trial:

"We were met at the homicide bureau 4th floor room 432 by Attorney Early and Attorney Massey, and several members of the church. I talked to Early, Attorney Early, and told him that Detective Backman and myself would like to go out to the house, and we would like to gain entrance through the house but we did not have the keys. Would he ask his client, Mr. Kaigler, if it was possible that he

might still have the keys on his person. He agreed to do that.   *   *   *

"I went with Attorney Early to the 9th floor of police headquarters, to the rear portion of the cells, and were met by Mr. Kaigler, Reverend Kaigler and talked to Reverend Kaigler, that is, Early and myself, and we were informed by the reverend that the keys were probably still in the house at the time of his arrest. He did not have them with him, and he was sure the officers locked the door on the way out.

"We then asked if it was anyway possible to get into the house. We were informed by the reverend that it was possible that if we went around to the side it was the side where the driveway was, through the rear of the house was a sunroom which was used as an office and there is a side door there. He said it is possible if you use a skeleton key or possibly a knife you could pull back the door, the lock, and get in that way. We asked him if it was possible if we couldn't get in that way, could we break a little portion of glass out to gain admission. He said it was quite all right with him. Then he said, 'Well, wait a minute. I have an alternative method. Maybe,' he said, 'on the side, in the dining room, I usually leave the center window open.' He said, 'It is possible if that is open you can go in through that way.'   *   *   *

"We tried the back door but I guess we weren't very good burglars, we couldn't get into there, so we went around to the side, and Dokendorf being the smaller of Backman and I, we would probably get stuck in the window—went up on the car which was parked alongside the window, dining room window, and Dokendorf, Patrolman Dokendorf climbed to the porch, the top of the car, opened the window, which was open, which was unlocked.

"*Q.* The same window?

"*A.* Same window described by the reverend.

"*Q.* The defendant had indicated?

"*A.* That is right, and got into the house."

Appellant's first question under "Statement of Questions Involved" is as follows:

"Did the lower court commit reversible error in failing to grant the defendant's motion to suppress evidence, namely the tape recording, for the reason that such was the product of an unlawful search and seizure?"

We answer that question "No."

We grant, however, appellant's prayer of relief "that this case be reversed and remanded for a new trial" under 2 other questions presented, namely questions 6 and 9:

"Question 6: Did the trial court commit reversible error by permitting the introduction of the tape recording, exhibit 21, for the reason that such was a denial of appellant's constitutional privileges of due process guaranteed to appellant by the Constitution of the State of Michigan and by the Fourteenth Amendment to the Constitution of the United States, in that the exhibit was surreptitiously acquired and was so highly inflammatory and prejudicial?"

"Question 9: Did the trial court commit reversible error in permitting the prosecutor upon cross-examination of the defendant to extensively interrogate defendant concerning his premarital sex relations with the deceased, adultery, legitimacy of defendant's adopted children, and the financial relationships between the defendant and his deceased wife and between the defendant and his former wife?"

Referring to question 6, appellant in his brief states:

"That the contents of the recording were so highly inflammatory and prejudicial in the eyes of the jury as to deprive the defendant of a fair and impartial trial. Of course, any evidence supporting the prosecution's theory is damaging to the defendant. But there are limits to what the prosecution may intro-

duce. And even admitting, *per arguendo,* that the recording was properly authenticated and was part of the *res gestae,* and that selected portions of the tape could have been played to the jury (or transcribed on paper and read to the jury, see *United States* v. *McKeever* [CCA 2], 271 F2d 669), nevertheless we contend error was committed by playing the entire tape. The tape must be heard to appreciate our position, but it contains detailed, explicit and uneuphemistic discussion and argument concerning financial, domestic, marital, sexual, and religious matters, problems of unfaithfulness, and obscene and self-serving remarks of a nature which could not otherwise be gotten into evidence."

As to question 9, appellant says:

"The tape resulted in introducing into the trial a scattershot of issues having nothing whatsoever to do with the guilt or innocence of the accused, and very little to do with anything else of relevance. The effect of permitting that tape to be introduced, along with permitting the prosecutor to roam unfettered upon so many irrelevant issues during cross-examination, could have as its exclusive purpose and result the prejudicing of the minds of the jurors against the defendant. The matters were irrelevant and inflammatory and of hindrance rather than of assistance in the search for truth."

Defendant was cross-examined in regard to his sexual relations with his wife previous to their marriage; whether he was the father of his wife's children which he adopted after marriage; the facts relating to his having been married 3 times; whether his second wife accused him of infidelity; how much property he acquired while being pastor of his first church; how many pieces of property he bought while he was a minister; his annual income; the facts regarding his transfers from different churches and the reasons for his leaving; whether it was not a fact

he had been asked to resign by his superiors, and how he got his severance pay.

The following questions and answers are but a sample of the improper cross-examination of defendant:

"*Q.* At that time, before you left the Madison church, weren't you making around $10,000 a year?

"*A.* No.

"*Q.* How much were you making?

"*A.* Wasn't making that.

"*Mr. Early:* I object, going into his finances again. I don't see any relevancy.

"*The Court:* Well, the question has arisen here about why he left one church. I don't know what Mr. Ziskie is going to develop from it but it has a bearing upon the integrity of the witness. I think it is proper.

"*Mr. Ziskie:* Thank you, your Honor.

"*Q.* (By Mr. Ziskie, continuing): If you weren't making $10,000 a year, Kaigler, how much were you making before you left the Madison church?

"*A.* One hundred dollars a week is all I ever made, sir.

"*Q.* Are you sure?

"*A.* That's right.

"*Q.* Well, didn't you and your—in your own answer to your wife's bill of complaint for divorce say you made more than that?

"*A.* She said it; I didn't.

"*Q.* Didn't you say it?

"*A.* No.

"*Q.* Didn't you get $25 a month for your car?

"*A.* No.

"*Q.* You didn't?

"*A.* No.

"*Q.* How much did you get for your car?

"*A.* None at all.

"*Q.* You got no car allowance whatsoever?

"*A.* That is right, none at all.

"*Q.* You sure about that?

"*A.* That is right.

*"Q.* Without contradiction?

*"A.* That is right, without true contradiction.

*"Q.* Pardon me?

*"A.* Without true contradiction.

*"Q.* Now, making $100 a week at that time, how many pieces of property did you have at the same time?

*"Mr. Early:* I am going to object to that. I really don't see the relevancy, going through the property, back and forth.

*"The Court:* Well, this has a bearing upon his disputes with the deceased.

*"Mr. Early:* That is while he is married to his second wife.

*"Mr. Ziskie:* I said while he was on Madison.

*"Mr. Early:* Well, he was married.

*"Mr. Ziskie:* He had already known Clara at that time.

*"Mr. Early:* He is married to the second wife then. I don't see where it is proper.

*"The Court:* I think he may go into it.

*"Mr. Ziskie:* All right.

*"The Witness:* Do I have to answer 'yes' or 'no'?

*"Q.* (By Mr. Ziskie, continuing): No. I asked you how many pieces of property did you own at the time that you were making $100 a week and didn't get any car allowance?"

We agree with the appellant that: "The effect of permitting that tape to be introduced, along with permitting the prosecutor to roam unfettered upon so many irrelevant issues during cross-examination, could have as its exclusive purpose and result the prejudicing of the minds of the jurors against the defendant. The matters were irrelevant and inflammatory and of hindrance rather than of assistance in the search for truth."

The following from our decision in *People* v. *Kelsey,* 303 Mich 715, 718, 719, is applicable to this type of cross-examination:

"The prosecutor contends that the aforementioned cross-examination was for the purpose of testing the memory and credibility of the defendant. We think, however, that the interrogation went far beyond the boundaries of permissible cross-examination. Such an examination could have been for no other purpose than to create prejudice in the minds of the jurors. The tactics pursued have been previously condemned in *People* v. *Gotshall,* 123 Mich 474; *People* v. *Dowell,* 136 Mich 306; and *People* v. *Wright,* 294 Mich 20."

The playing of the tape before the jury required 70 minutes and because it was too difficult for the reporter to separate the background television programs that could be heard from the words of defendant and wife, the reporter made no effort to take down and report the tape.

In a written opinion denying defendant's motion for a new trial the trial court stated:

"The tape does reveal that as the evening lengthened, the tempo of the discussions between defendant and his wife became more violent. Among the passages were accusations of infidelity, recriminations of personal conduct of both parties, frank remarks of intimate relations between the 2 individuals, as well as discussions of property owned by them. There were statements about shooting, among them being a statement by defendant 'I'll blow your God dam brains out.' Also when reminded by deceased he would go to Jackson if he shot her, he said he did not care as he was an old man who didn't have many more years to live and he didn't mind spending the rest of them in Jackson."

Upon retrial this statement of the trial court, or one similar, would bring before the jury the salient facts, and if defendant so desires this be done instead of playing the tape, such a procedure should be adopted. Such a course would establish that there was a violent quarrel preceding the shooting, in-

cluding accusations of infidelity, disputes in regard
to property, et cetera, but it would prevent confusing
the jury by introducing testimony endeavoring to
prove the truth or falsity of the numerous irrelevant
accusations.

Defendant-appellant's prayer that this case be re-
versed and remanded for new trial is granted.

OTIS M. SMITH, J., concurred with KELLY, J.

SOURIS, J. (*concurring*). I concur in reversal and
remand for new trial for the reasons stated by Mr.
Justice KELLY. I also agree with him that this rec-
ord does not justify a finding by us that errors were
committed in denying defendant's motions to sup-
press evidence seized by the police during a search
of defendant's home the morning following his ar-
rest.

The prosecutor claimed defendant consented to the
police entry of his home and its search. Mr. Justice
KAVANAGH concludes that such consent was not free
from duress and coercion because of Detective-Ser-
geant Harris' statement "that defendant's home was
going to be searched even if defendant did not give
the keys to the police." I find no such statement in
the record, nor do I find any other evidence to justify
the conclusion that defendant's consent was coerced.
It is true that the brief filed below by the prosecutor
in opposition to defendant's motion to suppress con-
tained reference to a conversation between 2 police
officers and defendant's counsel in which:

"The officers *told counsel* they did not find any keys
in defendant's property, and were anxious to enter
the home without creating damage and leaving the
premises exposed to any prowler, but were going *to
continue the investigation of the crime* whether or
not they had keys" (emphasis added);

but that statement alone is far from evidence of a threat to defendant that even if he did not give the police the keys to his home, so that they could enter to search it, they would search it anyway.

The tape recording seized from defendant's home should have been excluded from evidence because of the inflammatory and prejudicial nature of its contents, as detailed by Mr. Justice KELLY, but I do not believe this record would justify its suppression in advance of trial on the ground that defendant's consent to the search of his home, during which it was seized, was coerced.

BLACK, J. (*concurring*).   I concur with Justice KAVANAGH.   It is probably needless yet wise to note that we appraise exclusively the legal worth, as of submission below, of a motion to suppress seized articles of personal property.   Such a motion is not to be confused with a pretrial motion to suppress an admission or confession.

ADAMS, J., did not sit.