# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

JOHNSON v VANDERKOOI
HARRISON v VANDERKOOI

Docket Nos. 160958 and 160959. Argued November 9, 2021 (Calendar No. 3). Decided July 22, 2022.

In Docket No. 160958, Denishio Johnson filed an action in the Kent Circuit Court against the city of Grand Rapids (the City) and Captain Curtis VanderKooi and Officer Elliott Bargas of the Grand Rapids Police Department (the GRPD). Johnson asserted claims under 42 USC 1981 and 42 USC 1983, alleging violations of his constitutional rights. The matter originated in 2011 when the GRPD investigated a complaint that a person, eventually identified as Johnson, was looking into vehicles in a parking lot. After GRPD officers stopped Johnson in the parking lot and were unable to confirm his identity or age, Bargas photographed and fingerprinted Johnson in accordance with the City's photograph and print (P&P) procedure. VanderKooi, who arrived at the scene at some point during this process, approved of Bargas's actions. The GRPD regularly used the P&P procedure for gathering identifying information about individuals during the course of a field interrogation or a stop if an officer deemed it appropriate based on the facts and circumstances of that incident. Johnson was ultimately released and was not charged with a crime. VanderKooi, Bargas, and the City moved separately for summary disposition. The court, George J. Quist, J., granted VanderKooi's and Bargas's motions for summary disposition of Johnson's § 1981 and § 1983 claims and also granted the City's motion for summary disposition, holding, in relevant part, that Johnson had failed to establish that the P&P procedure was unconstitutional on its face or as applied. Johnson appealed, and the Court of Appeals, BOONSTRA and O'BRIEN, JJ. (WILDER, P.J., not participating), affirmed. 319 Mich App 589 (2017).

In Docket No. 160959, Keyon Harrison brought a separate action in the Kent Circuit Court against VanderKooi and the City. Harrison asserted claims under 42 USC 1981, 42 USC 1983, and 42 USC 1988, alleging violations of his constitutional rights. The matter originated in 2012 after VanderKooi saw Harrison give someone a large model train engine. VanderKooi became suspicious and confronted Harrison after following him to a nearby park. Still suspicious after speaking with Harrison, VanderKooi asked another officer to come to the scene and photograph Harrison. An officer arrived and performed a P&P on Harrison. When told that his fingerprints would be taken, Harrison had asked, "[W]hy[?]" In response, VanderKooi stated it was "just to clarify again to make sure you are who you say you are." Harrison then responded, "[O]kay." After the P&P, Harrison was released and was not charged with a crime. VanderKooi and the City

moved for summary disposition, which the court, George J. Quist, J., granted, holding, in relevant part, that Harrison had not shown that the P&P procedure was unconstitutional. Harrison appealed, and the Court of Appeals, BOONSTRA and O'BRIEN, JJ. (WILDER, P.J., not participating), affirmed in an unpublished per curiam opinion issued May 23, 2017 (Docket No. 330537).

The reasoning of the Court of Appeals was the same in both cases with regard to municipal liability: the City could not be held liable because neither Johnson nor Harrison had demonstrated that any alleged constitutional violation resulted from a municipal policy or a custom that was so persistent and widespread as to practically have the force of law. The Court of Appeals did not decide whether the P&Ps in these cases violated Johnson's or Harrison's Fourth Amendment right to be free from unreasonable searches and seizures. Johnson and Harrison filed a joint application for leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 501 Mich 954 (2018). In lieu of granting leave to appeal, the Supreme Court held that the Court of Appeals erred by affirming the trial court's orders granting summary disposition in favor of the City based on the Court's conclusion that the alleged constitutional violations were not the result of a policy or custom of the City; accordingly, the Supreme Court reversed Part III of the Court of Appeals' judgments and remanded the cases to the Court of Appeals to determine whether the P&Ps at issue violated plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures. 502 Mich 751 (2018). On remand, the Court of Appeals, BOONSTRA, P.J., and O'BRIEN and LETICA, JJ., concluded that neither taking a person's fingerprints nor their photograph was a search under the Fourth Amendment and that the P&Ps did not infringe on plaintiffs' Fourth Amendment rights. 330 Mich App 506 (2019). Plaintiffs again filed a joint application for leave to appeal in the Supreme Court, and the Supreme Court granted leave to appeal. 507 Mich 880 (2021).

In a unanimous opinion by Justice BERNSTEIN, the Supreme Court *held*:

The Court of Appeals erred by finding that no constitutionally protected interest was violated by the P&P policy; fingerprinting constitutes a search under the trespass doctrine, and the P&P policy was facially unconstitutional because it authorized the GRPD to engage in unreasonable searches contrary to the Fourth Amendment.

1. The Fourth Amendment of the United States Constitution protects the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. Under the common-law trespass doctrine, a search occurs when the government physically intrudes on a constitutionally protected area to obtain information. The trespass doctrine exists alongside the test in *Katz v United States*, 389 US 347 (1967), which provides that a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable. Because the trespass doctrine exists alongside the *Katz* test, the *Katz* test is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas, as was the case here. The fingerprinting of each of the plaintiffs in these cases constituted a physical trespass onto a person's body, a constitutionally protected area, and the act of fingerprinting was done to obtain information to confirm plaintiffs' identities. Accordingly, fingerprinting pursuant to the P&P policy constituted a search under the Fourth Amendment. The Court of Appeals erred by finding that no constitutionally protected interest was violated by the P&P policy.

2. Generally, warrantless searches are per se unreasonable under the Fourth Amendment, subject to several exceptions, including the stop-and-frisk exception and the consent exception. In these cases, defendants only argued that fingerprinting was appropriate under *Terry v Ohio*, 392 US 1 (1968), and that Harrison consented to fingerprinting. Under *Terry*, a brief, on-the-scene detention of an individual is not a violation of the Fourth Amendment as long as the officer can articulate a reasonable suspicion for the detention. In these cases, fingerprinting pursuant to the P&P policy exceeded the permissible scope of a *Terry* stop because it was not reasonably related in scope to the circumstances that justified either stop; fingerprinting is not related to an officer's immediate safety, and *Terry* caselaw does not justify stops merely for the general purpose of crime-solving. The fingerprinting in these cases also exceeded the permissible duration of a *Terry* stop. In Docket No. 160959, VanderKooi called an officer in for backup to execute the P&P policy, but Harrison had already answered questions regarding his identity; therefore, calling another officer for backup after having already determined that no criminal activity was taking place was beyond the permissible duration of the *Terry* stop. Similarly, in Docket No. 160958, as soon as the officers concluded that no crime had taken place in the parking lot where Johnson was detained, the reasons justifying the initial stop were dispelled, and execution of the P&P policy was an impermissible extension of the duration of the *Terry* stop. Because the P&P policy impermissibly exceeded both the scope and duration of a *Terry* stop, neither of the searches fell within the stop-and-frisk exception to the warrant requirement. The Court of Appeals, having found that fingerprinting was not a search, did not address the application of the consent exception to the warrant requirement in Docket No. 160959. Accordingly, Harrison's case had to be remanded to the Court of Appeals to determine whether the prosecution can establish that Harrison's consent was freely and voluntarily given.

3. To sustain a facial challenge, the party challenging the statute must establish that no set of circumstances exists under which the statute would be valid. When addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes. In these cases, the P&P policy authorized the GRPD to conduct unreasonable searches in violation of the Fourth Amendment; accordingly, the P&P policy was facially unconstitutional. The Court of Appeals holding on this issue was reversed.

Reversed; Johnson's case remanded to the Kent Circuit Court for further proceedings, and Harrison's case remanded to the Court of Appeals to determine whether the prosecution established that Harrison voluntarily consented to fingerprinting.

Justice WELCH, joined by Chief Justice MCCORMACK and Justice CAVANAGH, concurring, agreed in full with the majority opinion but wrote separately to explain why the P&P policy also infringed upon an individual's reasonable expectation of privacy and thus constituted a Fourth Amendment search under *Katz v United States*, 389 US 347 (1967), and its progeny. While the taking of fingerprints directly from one's body is a search under *United States v Jones*, 565 US 400 (2012), the collection and use of biometric information might not always require a physical trespass sufficient to trigger *Jones*, and Justice WELCH would conclude that a search occurred in the absence of the *Jones* line of precedent. Without specialized training or advanced analytical software, the details of one's fingerprint structure are neither readily observable nor even very useful. Additionally, a copy of a person's fingerprints is biometric data that can be used for many things beyond individual identification; people regularly use fingerprints and other biometric markers as security measures for accessing electronic devices, secured digital spaces, or restricted

places. These considerations and the lived experiences of average people strongly suggest that the individualized privacy expectations surrounding one's fingerprints have not only become more robust over time, but also that society widely views such expectations as reasonable. Accordingly, the collection of biometric information from a person's body, such as the lifting of one's fingerprints, is a search for Fourth Amendment purposes, and the focus of judicial review should include an analysis of the reasonableness of the search under the circumstances.

# OPINION

Chief Justice:
 Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 22, 2022

STATE OF MICHIGAN

SUPREME COURT

DENISHIO JOHNSON,

        Plaintiff-Appellant,

v                                   No. 160958

CURTIS VANDERKOOI, ELLIOTT
BARGAS, and CITY OF GRAND RAPIDS,

        Defendants-Appellees.

_____

KEYON HARRISON,

        Plaintiff-Appellant,

v                                   No. 160959

CURTIS VANDERKOOI and CITY OF
GRAND RAPIDS,

        Defendants-Appellees.

_____

BEFORE THE ENTIRE BENCH

BERNSTEIN, J.

This is the second time these consolidated cases have come before us. Previously, we considered whether a decades-long procedure used by the Grand Rapids Police Department (the GRPD) was a policy or a custom attributable to the city of Grand Rapids (the City). We held that it was.

We now consider the constitutionality of the GRPD's policy of photographing and fingerprinting individuals stopped without probable cause, referred to as the "photograph and print" (P&P) procedure. In considering the fingerprint component of the P&P procedure, we hold that the P&P procedure is unconstitutional.[1] Fingerprinting an individual without probable cause, a warrant, or an applicable warrant exception violates an individual's Fourth Amendment rights. Accordingly, we reverse the judgment of the Court of Appeals and remand these cases for further proceedings that are consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The underlying facts of these consolidated cases have not changed since they were last before us. We previously summarized the relevant facts as follows:

> The P&Ps giving rise to these lawsuits took place during two separate incidents. At the time of the incidents, each GRPD patrol officer was assigned as a part of their standard equipment a camera, a fingerprinting kit, and GRPD "print cards" for storing an individual's copied fingerprints. Generally speaking, a P&P involved an officer's use of this equipment to take a person's photograph and fingerprints whenever an officer deemed the P&P necessary given the facts and circumstances. After a P&P was completed, the photographs were uploaded to a digital log. Completed print cards were collected and submitted to the Latent Print Unit. Latent print

---

[1] Because plaintiffs have effectively abandoned their challenge to the constitutionality of the photograph component of the P&P procedure, we do not address that aspect of the P&P procedure.

2

examiners then checked all the submitted fingerprints against the Kent County Correctional Facility database and the Automated Fingerprint Identification System.  After being processed, the cards were filed and stored in a box according to their respective year.

The first incident giving rise to these lawsuits involved the field interrogation of plaintiff Denishio Johnson.  On August 15, 2011, the GRPD received a tip that a young black male, later identified as Johnson, had been observed walking through an athletic club's parking lot and peering into vehicles.  Officer Elliott Bargas responded to the tip and initiated contact with Johnson.  Johnson, who had no identification, told Bargas that he was 15 years old, that he lived nearby, and that he used the parking lot as a shortcut.  Bargas was skeptical of Johnson's story, and being aware of several prior thefts in and near the parking lot, he decided to perform a P&P to see if any witnesses or evidence would tie Johnson to those crimes.  After Johnson's mother arrived and verified his name and age, Johnson was released.  At some point during this process, Captain Curtis VanderKooi arrived and approved Bargas's actions.  Johnson was never charged with a crime.

The second event occurred on May 31, 2012, after VanderKooi observed Keyon Harrison, a young black male, walk up to another boy and hand him what VanderKooi believed was a large model train engine.  Suspicious of the hand-off, VanderKooi followed Harrison to a park.  After initiating contact, VanderKooi identified himself and questioned Harrison.  Harrison, who had no identification, told VanderKooi that he had been returning the train engine, which he had used for a school project.  VanderKooi, still suspicious, radioed in a request for another officer to come take Harrison's photograph.  Sergeant Stephen LaBrecque arrived a short time later and performed a P&P on Harrison, despite being asked to take only a photograph.  Harrison was released after his story was confirmed, and he was never charged with a crime.

Johnson and Harrison subsequently filed separate lawsuits in the Kent Circuit Court, and the cases were assigned to the same judge.  Plaintiffs argued, in part, that the officers and the City were liable pursuant to 42 USC 1983 for violating plaintiffs' Fourth and Fifth Amendment rights when the officers performed P&Ps without probable cause, lawful authority, or lawful consent.  Both plaintiffs also initially claimed that race was a factor in the officers' decisions to perform P&Ps, though Johnson later dropped that claim.

In two separate opinions, the trial court granted summary disposition in favor of the City pursuant to MCR 2.116(C)(10) and in favor of the officers

3

pursuant to MCR 2.116(C)(7), (C)(10), and (I)(2). Plaintiffs individually appealed by right in the Court of Appeals. In two separate opinions relying on the same legal analysis, the Court of Appeals affirmed the trial court's judgments regarding plaintiffs' municipal-liability claims. Specifically, the Court of Appeals held that the City could not be held liable because plaintiffs did not demonstrate that any of the alleged constitutional violations resulted from a municipal policy or a custom so persistent and widespread as to practically have the force of law. [*Johnson v VanderKooi*, 319 Mich App 589, 626-628; 903 NW2d 843 (2017).] The Court of Appeals did not decide whether the P&Ps actually violated either plaintiff's Fourth Amendment rights.

Plaintiffs filed a joint application for leave to appeal in this Court, challenging the Court of Appeals' ruling on the City's liability under 42 USC 1983. They argued that the record demonstrated that the City had a policy or custom of performing P&Ps without probable cause during investigatory stops pursuant to *Terry v Ohio*, 392 US 1, 22; 88 S Ct 1868; 20 L Ed 2d 889 (1968), which may be based on reasonable suspicion of criminal conduct, and that execution of that policy or custom violated their Fourth Amendment rights. We scheduled oral argument on the application and instructed the parties to address "whether any alleged violation of the plaintiffs' constitutional rights [was] the result of a policy or custom instituted or executed by the defendant City of Grand Rapids." *Johnson v VanderKooi*, 501 Mich 954, 954-955 (2018). [*Johnson v VanderKooi*, 502 Mich 751, 757-761; 918 NW2d 785 (2018).]

Following oral argument, we reversed the judgment of the Court of Appeals in part, holding that a policy or custom that authorizes police officers to engage in specific conduct may form the basis for municipal liability. We held that genuine issues of material fact existed as to both whether the custom had become an official policy and whether this custom had caused the alleged constitutional violations.

Therefore, the Court of Appeals erred by affirming the trial court's order granting summary disposition based on the Court's conclusion that the alleged constitutional violations were not the result of a policy or custom of the City. We express no opinion with regard to whether plaintiffs' Fourth Amendment rights were violated. Therefore, we reverse Part III of the Court of Appeals' opinion in both cases. We remand these cases to the Court of Appeals to determine whether the P&Ps at issue here violated plaintiffs'

4

Fourth Amendment right to be free from unreasonable searches and seizures. [*Johnson*, 502 Mich at 781.]

On remand, the Court of Appeals considered "whether the specific conduct authorized by the City's policy or custom, i.e., the conducting of P&Ps on the basis of reasonable suspicion (rather than probable cause), resulted in a constitutional violation." *Johnson v VanderKooi (On Remand)*, 330 Mich App 506, 517; 948 NW2d 650 (2019). The Court of Appeals held that the P&Ps did not infringe on plaintiffs' Fourth Amendment rights, having concluded that taking neither a person's fingerprints nor their photograph was a search under the Fourth Amendment. The Court of Appeals therefore concluded that plaintiffs failed to demonstrate that the City's P&P policy was unconstitutional.

Plaintiffs again filed a joint application for leave to appeal in this Court, continuing to argue that the P&P policy violated their Fourth Amendment rights. We granted leave to appeal, directing the parties to address:

> (1) whether fingerprinting constitutes a search for Fourth Amendment purposes; (2) if it does, whether fingerprinting based on no more than a reasonable suspicion of criminal activity, as authorized by the Grand Rapids Police Department's "photograph and print" procedures, is unreasonable under the Fourth Amendment; and (3) whether fingerprinting exceeds the scope of a permissible seizure pursuant to *Terry v Ohio*, 392 US 1 (1968). [*Johnson v VanderKooi*, 507 Mich 880, 880 (2021).]

## II. STANDARD OF REVIEW

"This Court reviews de novo both questions of constitutional law and a trial court's decision on a motion for summary disposition." *Associated Builders & Contractors v Lansing*, 499 Mich 177, 183; 880 NW2d 765 (2016).

5

## III.  FOURTH AMENDMENT SEARCH

### A.  SEARCH

The United States Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  US Const, Am IV.

Fourth Amendment jurisprudence was originally tied to common-law trespass and largely concerned physical intrusions onto property.  See *United States v Jones*, 565 US 400, 404-405; 132 S Ct 945; 181 L Ed 2d 911 (2012).  In noting that the Fourth Amendment protects people and not places, such that a physical intrusion is not necessary in order to find a constitutional violation, prior caselaw suggested that the trespass doctrine had been eroded by subsequent decisions and was no longer viable.  *Katz v United States*, 389 US 347, 352-353; 88 S Ct 507; 19 L Ed 2d 576 (1967).  The *Katz* test states that "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."  *Kyllo v United States*, 533 US 27, 33; 121 S Ct 2038; 150 L Ed 2d 94 (2011), citing *Katz*, 389 US at 361.

However, the United States Supreme Court recently clarified that an individual's "Fourth Amendment rights do not rise or fall with the *Katz* formulation."  *Jones*, 565 US at 406.  Specifically, the Supreme Court noted:

> At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  *Kyllo*, [533 US at 34].  As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates.  *Katz* did not repudiate that understanding.  [*Jones*, 565 US at 406-407.]

In other words, "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id*. at 409.

In *Jones*, the Supreme Court held that the installation of a GPS tracking device on a vehicle to monitor the vehicle's movement constituted a search under the Fourth Amendment: "Where, as here, the Government obtains information by physically intruding on a constitutionally protected area, such a search has undoubtedly occurred." *Id*. at 406 n 3. The Supreme Court held that "[t]respass alone does not qualify, but there must be conjoined with that what was present here: an attempt to find something or to obtain information." *Id*. at 408 n 5. Stated differently, a search occurs when the government "occupie[s] private property for the purpose of obtaining information." *Id*. at 404.

The Supreme Court has continued to apply the trespass doctrine, clarifying that it exists alongside the *Katz* test. See *Florida v Jardines*, 569 US 1, 11; 133 S Ct 1409; 185 L Ed 2d 495 (2013) ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred."). This Court has also applied the trespass doctrine. See *People v Frederick*, 500 Mich 228, 234-237, 240; 895 NW2d 541 (2017). Although these cases involved physical intrusions onto *property*, the United States Supreme Court has made it clear that physical intrusions onto an individual's *body* are also covered under the trespass doctrine.[2] In *Grady v North Carolina*, 575 US 306, 307; 135 S Ct 1368; 191 L Ed 2d 459 (2015), the

---

[2] This caselaw only confirms the plain meaning of the text of the Fourth Amendment, which makes clear that an individual's body is constitutionally protected under the trespass doctrine: "The right of the people to be secure in their *persons*, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." US Const, Am IV (emphasis added).

7

petitioner argued that a satellite-based monitoring program, which was imposed on him because of his multiple prior convictions as a sex offender, violated the Fourth Amendment. Because the monitoring program required the petitioner to wear a tracking device, the petitioner argued that this constituted a search under *Jones*. *Id*. The Supreme Court agreed: "The State's program is plainly designed to obtain information. And since it does so by physically intruding on a subject's body, it effects a Fourth Amendment search." *Id*. at 310.[3]

Because the trespass doctrine exists alongside the *Katz* test, the *Katz* test "is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." *Jardines*, 569 US at 11. As the Supreme Court has stated, "One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." *Id*. Such is the case here.[4]

As directed by *Jones* and *Grady*, we consider whether there was a physical trespass on a constitutionally protected area and whether there was an attempt to obtain information.[5] Again, the Fourth Amendment protects both the right of people to be secure

---

[3] See also *Skinner v R Labor Executives' Ass'n*, 489 US 602, 613-614; 109 S Ct 1402; 103 L Ed 2d 639 (1989) (stating that the Fourth Amendment "guarantees the . . . security of *persons* against certain arbitrary and invasive acts by officers of the Government") (emphasis added).

[4] For this reason, we decline to address plaintiffs' argument that the P&P policy is unconstitutional because they have a reasonable expectation of privacy in their fingerprints.

[5] Defendants argue that plaintiffs cannot proceed with a trespass argument because it was not properly raised before the lower courts and is therefore unpreserved. But plaintiffs have consistently raised and presented a Fourth Amendment challenge to the P&P policy. That the United States Supreme Court recognizes two separate tests for determining whether a search has occurred under the Fourth Amendment does not change the fact that

in their own persons as well as in their houses and effects. The fingerprinting of each of the plaintiffs in these cases constituted a physical trespass onto a person's body, a constitutionally protected area.[6] That the act of fingerprinting is done for the very *purpose* of obtaining information is clear; defendants' entire argument justifying the P&P policy was that fingerprinting was necessary under these circumstances to confirm an individual's identity. Accordingly, we hold that fingerprinting pursuant to the P&P policy constitutes a search under the Fourth Amendment.

## B. REASONABLENESS OF THE SEARCH

The determination that fingerprinting pursuant to the P&P policy constitutes a search does not end our inquiry. "The Fourth Amendment is not, of course, a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v Sharpe*, 470 US 675, 682; 105 S Ct 1568; 84 L Ed 2d 605 (1985). Thus, we now turn to the question of whether these searches were reasonable. The general rule

---

the underlying constitutional argument has been preserved. See *Yee v Escondido, California*, 503 US 519, 534-535; 112 S Ct 1522; 118 L Ed 2d 153 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below. . . . Petitioners' arguments that the ordinance constitutes a taking in two different ways, by physical occupation and by regulation, are not separate *claims*. They are, rather, separate *arguments* in support of a single claim—that the ordinance effects an unconstitutional taking.").

[6] Although defendants argue that the physical intrusion here cannot constitute common-law trespass, both because common-law trespass against a person is an antiquated concept and because United States Supreme Court caselaw largely deals with property-based trespass, these arguments stand in stark contrast to the holding in *Grady*, which recognized that a physical intrusion on a body sufficed under the trespass approach. Accordingly, we apply *Grady* in holding that a physical intrusion on a person's body constitutes a trespass under the Fourth Amendment.

is that warrantless searches are per se unreasonable under the Fourth Amendment, subject to a few specific exceptions. *Arizona v Gant*, 556 US 332, 338; 129 S Ct 1710; 173 L Ed 2d 485 (2009). These exceptions include, but are not limited to, the following: "(1) searches incident to a lawful arrest, (2) automobile searches, (3) plain view seizure, (4) consent, (5) stop and frisk, and (6) exigent circumstances." *In re Forfeiture of $176,598*, 443 Mich 261, 266; 505 NW2d 201 (1993).

To the extent that defendants argue that any of the established exceptions to the warrant requirement apply here, they argue only that fingerprinting was appropriate under *Terry*[7] and that Harrison consented to fingerprinting.[8] We address those exceptions in turn.

1. *TERRY* STOP

A *Terry* stop is " '[a] brief, on-the-scene detention of an individual [that] is not a violation of the Fourth Amendment as long as the officer can articulate a reasonable suspicion for the detention.' " *People v Pagano*, 507 Mich 26, 32; 967 NW2d 590 (2021), quoting *People v Custer*, 465 Mich 319, 327; 630 NW2d 870 (2001). Although it is undisputed that reasonable suspicion existed to justify a brief seizure of each plaintiff, *Terry* stops are limited in both scope and duration. The question presented here is whether execution of the P&P policy exceeded either the permissible scope or duration of a *Terry* stop.

---

[7] This Court has recognized that the stop-and-frisk exception is governed by *Terry*. See *People v Shabaz*, 424 Mich 42, 51-52; 378 NW2d 451 (1985).

[8] Defendants do not argue that any special needs rendered the warrant and probable-cause requirement here impracticable. See *Griffin v Wisconsin*, 483 US 868, 873; 107 S Ct 3164; 97 L Ed 2d 709 (1987).

Regarding the permissible scope of a *Terry* stop, the Supreme Court noted that "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope. The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry*, 392 US at 18-19 (quotation marks and citations omitted). "The scope of the detention must be carefully tailored to its underlying justification." *Florida v Royer*, 460 US 491, 500; 103 S Ct 1319; 75 L Ed 2d 229 (1983). The Supreme Court noted that a search for weapons is reasonable during a *Terry* stop when there is reason to believe that an individual is armed and dangerous. *Terry*, 392 US at 27. However, "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but weapons." *Ybarra v Illinois*, 444 US 85, 93-94; 100 S Ct 338; 62 L Ed 2d 238 (1979).

Regarding the permissible duration of a *Terry* stop, in *Rodriguez v United States*, 575 US 348, 354; 135 S Ct 1609; 191 L Ed 2d 492 (2015), the Supreme Court made clear that a brief detention such as a *Terry* stop may last no longer than necessary to address the reasons justifying the stop. "The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.' " *Id*. at 355, quoting *Arizona v Johnson*, 555 US 323, 333; 129 S Ct 781; 172 L Ed 2d 694 (2009) (alteration by the *Rodriguez* Court). *Rodriguez* concerned a dog sniff that was conducted after a traffic stop was completed. Despite having previously concluded that a dog sniff conducted *during* a traffic stop did not violate the Fourth Amendment, see *Illinois v Caballes*, 543 US 405, 409; 125 S Ct 834; 160 L Ed 2d 842 (2005), the Supreme Court held that a stop prolonged beyond the time reasonably required to complete the stop's mission is unlawful, *Rodriguez*,

11

575 US at 357. "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" *Id*. (citations omitted).

Fingerprinting pursuant to the P&P policy exceeded the permissible scope of a *Terry* stop because it was not reasonably related in scope to the circumstances that justified the stop. Having held that fingerprinting constitutes a search, it is clear that fingerprinting does not fall within the limited weapons search that is justified under certain circumstances during a *Terry* stop; fingerprinting is simply not related to an officer's immediate safety concerns.

Defendants argue that fingerprinting nevertheless falls within the scope of a *Terry* stop because determining an individual's identity is an important government interest. The United States Supreme Court has recognized that "questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Hiibel v Sixth Judicial Dist Court of Nevada, Humboldt Co*, 542 US 177, 186; 124 S Ct 2451; 159 L Ed 2d 292 (2004). But the Supreme Court also held in *Hiibel* that the Fourth Amendment does not require an individual to answer such questions, *id*. at 187, and to the extent that a state statute can require an individual to disclose their name in the course of a *Terry* stop, a request for identification must still be reasonably related in scope to the circumstances that justified the stop, *id*. at 188-189.[9]

---

[9] *Hiibel* notes that past caselaw suggests that "*Terry* may permit an officer to determine a suspect's identity by compelling the suspect to submit to fingerprinting only if there is 'a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime.'" *Hiibel*, 542 US at 188, quoting *Hayes v Florida*, 470 US 811, 817; 105 S Ct 1643; 84 L Ed 2d 705 (1985). This language is arguably dicta. See

12

The fingerprinting in these cases was not reasonably related in scope to the circumstances that justified either stop. Absent some sort of indication that the GRPD has access to a database that includes the fingerprints of all residents of and visitors to the City, fingerprinting individuals who fail to carry government-issued identification does not seem to be a useful or productive exercise in *confirming* any individual's identity because there is no guarantee that a match exists that would provide more information. Instead, fingerprinting under the P&P policy appears to be aimed at solving past or future crimes. There is no indication in the record that the GRPD officers believed that fingerprinting would tie either plaintiff to the circumstances that justified each *Terry* stop. Notably, VanderKooi was informed over the radio that other officers were unable to retrieve the model train engine, and the record only suggests the existence of latent prints for prior break-ins in the parking lot. To the extent that defendants argue that fingerprinting could help the officers determine whether either plaintiff could be linked to *other* crimes, such as the prior break-ins, those crimes were necessarily unconnected to the reasons justifying the actual stops. It goes unsaid that *Terry* caselaw does not justify stops merely for the general purpose of crime-solving, especially for those crimes that have yet to occur.

The fingerprinting of each plaintiff also exceeded the permissible duration of a *Terry* stop. Recall that, before releasing Harrison, VanderKooi called an officer in for

---

*Hayes*, 470 US at 819 (Brennan, J., joined by Marshall, J., concurring in the judgment) ("The validity of on-site fingerprinting is no more implicated by the facts of this case than it was by *Davis*. . . . I disagree with the Court's strained effort to reach the question today."). In any event, the P&P policy contains no such limitations on its parameters, given that an officer may photograph and fingerprint any individual at their discretion, regardless of whether there is a reasonable basis for believing that fingerprinting could establish any connection with the suspected crime that justified the stop.

13

backup in order to execute the P&P policy; again, the purported reason for doing so was simply to clarify Harrison's identity. Harrison had already answered questions regarding his identity, and calling another officer for backup after having already determined that no criminal activity was taking place was beyond the permissible duration of the *Terry* stop. Even if fingerprinting, like a dog sniff, did not constitute a search under the Fourth Amendment, fingerprinting Harrison after concluding that no crime had occurred impermissibly extended the duration of the *Terry* stop. See *Rodriguez*, 575 US at 357. Similarly, as soon as the officers concluded that no crime had taken place in the parking lot where Johnson was detained, the reasons justifying the initial stop were dispelled, and execution of the P&P policy was an impermissible extension of the duration of the *Terry* stop.

Because the P&P policy impermissibly exceeds both the scope and duration of a *Terry* stop, neither of the searches conducted here falls within the stop-and-frisk exception to the warrant requirement. Accordingly, fingerprinting Johnson violated the Fourth Amendment prohibition against unreasonable searches, as defendants do not argue that any other exception applied to Johnson.

### 2. CONSENT

Defendants also argue that Harrison, who was a minor at the time, consented to fingerprinting. Specifically, when told that VanderKooi needed to take his fingerprints, Harrison asked, "[W]hy[?]" In response, VanderKooi stated it was "just to clarify again to make sure you are who you say you are." Harrison then responded, "[O]kay."

14

" 'When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority.' " *People v Farrow*, 461 Mich 202, 208; 600 NW2d 634 (1999), quoting *Bumper v North Carolina*, 391 US 543, 548-549; 88 S Ct 1788; 20 L Ed 2d 797 (1968). See also *People v Kaigler*, 368 Mich 281, 294; 118 NW2d 406 (1962) ("It is elementary that the obtaining of a search warrant may be waived by an individual and he may give his consent to search and seizure; but such waiver or consent must be proved by clear and positive testimony *and there must be no duress or coercion, actual or implied, and the prosecutor must show a consent that is unequivocal and specific, freely and intelligently given*."). Whether consent was voluntarily given concerns "whether a reasonable person would, under the totality of the circumstances, feel able to choose whether to consent." *Frederick*, 500 Mich at 242, citing *Schneckloth v Bustamonte*, 412 US 218, 227; 93 S Ct 2041; 36 L Ed 2d 854 (1973).

Defendants rely on the trial court's holding that Harrison consented to fingerprinting. Although the trial court considered Harrison's background, its analysis entirely failed to identify how the mere utterance of "okay" was enough to discharge the prosecutor's burden. Having found that fingerprinting is not a search, the Court of Appeals did not address the application of the consent exception to the warrant requirement. Accordingly, we remand the case to the Court of Appeals to determine whether the prosecution can establish that Harrison's consent was freely and voluntarily given.

15

## IV. FACIAL CHALLENGE

Although we find that the fingerprinting of each plaintiff violated the Fourth Amendment prohibition against unreasonable searches, defendants allege, and the Court of Appeals held, that plaintiffs' Fourth Amendment challenge was a facial challenge. To sustain a facial challenge, the party challenging the statute must establish that no set of circumstances exists under which the statute would be valid. *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). Despite the high bar presented by this language, the Supreme Court has clarified that "facial challenges under the Fourth Amendment are not categorically barred or especially disfavored." *Los Angeles v Patel*, 576 US 409, 415; 135 S Ct 2443; 192 L Ed 2d 435 (2015).

In *Patel*, the petitioner argued that "facial challenges to statutes authorizing warrantless searches must fail because such searches will never be unconstitutional in all applications." *Id*. at 417. The Supreme Court rejected this argument because "its logic would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches. For this reason alone, the City's argument must fail: The Court's precedents demonstrate not only that facial challenges to statutes authorizing warrantless searches can be brought, but also that they can succeed." *Id*. at 418. The Supreme Court explained that, in applying the exacting standard for facial challenges, which requires a challenger to establish that a law is unconstitutional in all its applications, "the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct." *Id*.

> Similarly, when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant.

16

> If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented. Accordingly, the constitutional "applications" that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute. [*Id*. at 418-419.]

The Supreme Court then concluded that the statute at issue, which authorized nonconsensual inspection of hotel records without a warrant or precompliance review, was facially unconstitutional. *Id*. at 419.

As stated in *Patel*, the facial-challenge standard does not require us to hypothesize about circumstances that are not governed by the P&P policy. We have held that fingerprinting constitutes a search under the Fourth Amendment and that the P&P policy authorizes such searches to be conducted without probable cause or a warrant. That specific exceptions to the warrant requirement might apply in any *particular* case is of no constitutional import, as this says nothing about the general operation of the policy itself.[10] The P&P policy still authorizes the GRPD to conduct unreasonable searches in violation of the Fourth Amendment; indeed, such was the case for each of the plaintiffs before us. Accordingly, we hold that the P&P policy is facially unconstitutional.[11] We therefore

---

[10] Accordingly, it is irrelevant to our inquiry here whether the Court of Appeals determines that Harrison consented to fingerprinting. As stated by the Supreme Court, a policy that authorizes warrantless searches "do[es] no work where the subject of a search has consented." *Patel*, 576 US at 419. Where there is consent, the application of the policy itself is not at issue, and thus consent is irrelevant to the question of whether the policy is facially unconstitutional.

[11] Because we hold that the P&P policy is facially unconstitutional, it is unnecessary to decide whether plaintiffs adequately pleaded as-applied claims. To the extent that our Fourth Amendment analysis is largely grounded in the specific facts of the cases before us,

17

reverse the Court of Appeals holding on this issue and remand these cases for further proceedings.

## V. CONCLUSION

We conclude that the Court of Appeals erred by finding that no constitutionally protected interest was violated by the P&P policy. Specifically, we hold that fingerprinting constitutes a search under the trespass doctrine and that the P&P policy is facially unconstitutional because it authorizes the GRPD to engage in unreasonable searches contrary to the Fourth Amendment. Accordingly, we reverse the judgment of the Court of Appeals. We remand Johnson's case to the Kent Circuit Court for further proceedings not inconsistent with this opinion, and we remand Harrison's case to the Court of Appeals for that Court to determine whether the prosecution established that Harrison voluntarily consented to fingerprinting. We do not retain jurisdiction.

Richard H. Bernstein
Bridget M. McCormack
Brian K. Zahra
David F. Viviano
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

---

it is only because these facts help illustrate how the P&P policy interacts with constitutional principles.

18

STATE OF MICHIGAN

SUPREME COURT

DENISHIO JOHNSON,

      Plaintiff-Appellant,

v                                       No. 160958

CURTIS VANDERKOOI, ELLIOTT
BARGAS, and CITY OF GRAND RAPIDS,

      Defendants-Appellees.

_____

KEYON HARRISON,

      Plaintiff-Appellant,

v                                       No. 160959

CURTIS VANDERKOOI and CITY OF
GRAND RAPIDS,

      Defendants-Appellees.

_____

WELCH, J. (*concurring*).

I am in full agreement with the majority opinion. I write separately to explain why the fingerprinting policy at issue also infringes upon an individual's reasonable expectation of privacy and thus constitutes a Fourth Amendment search under *Katz v United States*, 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), and its progeny. While such analysis may not be necessary when the alleged conduct amounts to a physical trespass, "[w]hen new technologies change what is exposed and what is hidden, the scope of Fourth Amendment protections can shift depending on the details of how the technologies work."

Kerr, *The Fourth Amendment and New Technologies: Constitutional Myths and the Case for Caution*, 102 Mich L Rev 801, 828 (2004). The collection and use of biometric information, such as fingerprints, may not always require a physical trespass sufficient to trigger *United States v Jones*, 565 US 400; 132 S Ct 945; 181 L Ed 2d 911 (2012), and thus courts should carefully examine the technologies at issue and how biometric data will be collected and used.

## I. EVOLUTION OF THE REASONABLE EXPECTATION OF PRIVACY STANDARD

The United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." US Const, Am IV. Scholars and jurists generally agree that the Fourth Amendment was at least partially motivated by widespread distrust of abusive search and seizure procedures colonial officials had used prior to our nation's founding. See, e.g., Weaver, *The Fourth Amendment and Technologically Based Surveillance*, 48 Tex Tech L Rev 231, 233 (2015); *United States v Verdugo-Urquidez*, 494 US 259, 266; 110 S Ct 1056; 108 L Ed 2d 222 (1990) ("The driving force behind the adoption of the [Fourth] Amendment . . . was widespread hostility among the former colonists to the issuance of writs of assistance empowering revenue officers to search suspected places for smuggled goods, and general search warrants permitting the search of private houses, often to uncover papers that might be used to convict persons of libel."). This is not surprising when one considers the incredible breadth of the writs of assistance that were commonplace in that era. Since then, courts have spilled a large amount of ink trying to define the contours of the Fourth Amendment. While our nation's Fourth Amendment law has, at

2

times, been described as unruly or worse, see *The Fourth Amendment and New Technologies*, 102 Mich L Rev at 809 & n 25, it is now relatively clear that situations involving a physical trespass can proceed under *Jones* while all other alleged searches are still subject to the "reasonable expectation of privacy" standard first articulated in *Katz*.

The "reasonable expectation of privacy" standard was developed in the context of assessing whether use of a listening device to eavesdrop on a telephone call in a phone booth was a search under the Fourth Amendment. *Katz*, 389 US at 349-350. Justice Harlan's concurrence is generally considered the controlling test, and it set forth two requirements for the constitutionality of Fourth Amendment searches: (1) whether the person had an "actual (subjective) expectation of privacy" in the thing to be searched, and (2) whether "the expectation be one that society is prepared to recognize as 'reasonable.' " *Id*. at 360-361 (Harlan, J., concurring). In Justice Harlan's view, it was critical that a person who closed the door of a phone booth behind them had a subjective expectation of privacy in the conversation and, at least at that time in history, society would have recognized this expectation as reasonable. *Id*. at 361-362.

The evolution of Fourth Amendment law since *Katz* was decided in 1967 has been anything but simple. For example, the United States Supreme Court has held that a privacy interest that a person knowingly exposes to the public is not entitled to Fourth Amendment protection under *Katz*. See, e.g., *Florida v Riley*, 488 US 445; 109 S Ct 693; 102 L Ed 2d 835 (1989) (holding that aerial surveillance of a backyard from a helicopter was not a search); *United States v Place*, 462 US 696; 103 S Ct 2637; 77 L Ed 2d 110 (1983) (holding that a dog sniff of a suitcase in an airport was not a search but that the evidence was inadmissible due to an unreasonably lengthy detention of the luggage); *United States v*

3

*Knotts*, 460 US 276; 103 S Ct 1081; 75 L Ed 2d 55 (1983) (holding that placing a "beeper" tracking device in an item purchased by a suspect was not a search or seizure);[1] *United States v Dionisio*, 410 US 1; 93 S Ct 764; 35 L Ed 2d 67 (1973) (holding that compelling the production of voice exemplars for use in a grand jury proceeding would not be a search). In fact, in *Dionisio*, the Supreme Court opined that

> [t]he physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world. [*Dionisio*, 410 US at 14.]

But the explosion of sense-enhancing technology that can reveal what would ordinarily be invisible or useless to the naked eye has created unique challenges for Fourth Amendment jurisprudence. See *Kyllo v United States*, 533 US 27, 34; 121 S Ct 2038; 150 L Ed 2d 94 (2001) (holding that the use of an infrared device to detect heat signatures radiating from a building was a search, at least where the technology was "not in general public use"). It is precisely because new technologies and analytic methods can make previously mundane information highly valuable that courts must take a critical look at new forms of information-gathering when considering whether a search has occurred. See Breyer, *Our Democratic Constitution*, 77 NYU L Rev 245, 261, 262 (2002) (describing the " 'privacy' problem" as "unusually complex" and that "the law protects privacy only because of the way in which technology interacts with different laws"). Moreover, given

---

[1] One might speculate that *Knotts* would be decided differently in a post-*Jones* world.

the pace of judicial review, appellate decisions considering the constitutionality of new investigative technologies often lag many years behind the development and implementation of such technologies. See *The Fourth Amendment and New Technologies*, 102 Mich L Rev at 869 (noting that as of 2004 "no Article III court at any level ha[d] decided whether an Internet user has a reasonable expectation of privacy in their e-mails stored with an Internet service provider; [or] whether encryption creates a reasonable expectation of privacy") (citations omitted). Similarly, smart phones had been in widespread use for years before the United States Supreme Court held in *Riley v California*, 573 US 373, 386; 134 S Ct 2473; 189 L Ed 2d 430 (2014), that police officers generally cannot search digital information on a cell phone as a search incident to arrest and instead a warrant will usually be required.

## II. THE CONFLICTING FINGERPRINTING PRECEDENT

This Court holds today that the old-fashioned process of fingerprinting with ink and paper is a search under *Jones* because it requires a physical trespass onto a constitutionally protected space, namely, a person's body. Moreover, it is generally accepted that fingerprinting as a part of booking following a valid arrest supported by probable cause, like a DNA cheek swab taken under similar circumstances, does not offend the Fourth Amendment. See *Maryland v King*, 569 US 435; 133 S Ct 1958; 186 L Ed 2d 1 (2013); *Schmerber v California*, 384 US 757; 86 S Ct 1826; 16 L Ed 2d 908 (1966); *United States v Iacullo*, 226 F2d 788 (CA 7, 1955), cert denied 350 US 966 (1956). But this general acceptance is premised primarily on the idea that the existence of probable cause or a valid arrest will generally make any such search that occurs reasonable under the circumstances.

5

See *King*, 569 US at 463-466. It is notable that Justices Scalia, Ginsburg, Sotomayor, and Kagan all strongly dissented from the majority opinion in *King* and emphasized that the DNA sampling that occurred in that case was done for purposes of solving crimes unrelated to why Mr. King had been arrested. *Id*. at 477-480 (Scalia, J., dissenting).

It might come as a surprise that the United States Supreme Court has never definitively answered whether fingerprinting is a search in and of itself or whether such procedures may be executed in the absence of probable cause of criminal wrongdoing. Over the years, there have been musings in dictum suggesting that perhaps one does not have a reasonable expectation of privacy in their fingerprints. For example, in *Davis v Mississippi*, 394 US 721, 727; 89 S Ct 1394; 22 L Ed 2d 676 (1969), the Supreme Court held that "[d]etentions for the sole purpose of obtaining fingerprints are no less subject to the constraints of the Fourth Amendment," but the Court went on to suggest the following in dicta:

> It is arguable, however, that, because of the unique nature of the fingerprinting process, such detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense. See *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the "third degree." Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time. For this same reason, the general requirement that the authorization of a judicial officer be obtained in advance of detention would

seem not to admit of any exception in the fingerprinting context. [*Davis*, 394 US at 727-728.]

Justice Harlan specifically did not join that part of the opinion.

Then, in *Hayes v Florida*, 470 US 811, 817; 105 S Ct 1643; 84 L Ed 2d 705 (1985), the Supreme Court stated:

> There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch. Cf. *United States v Place*, [462 US 696]. Of course, neither reasonable suspicion nor probable cause would suffice to permit the officers to make a warrantless entry into a person's house for the purpose of obtaining fingerprint identification.

Justices Brennan and Marshall specifically called out such unnecessary fingerprinting commentary as questionable dicta and refused to join that part of the opinion. *Hayes*, 470 US at 819 (Brennan, J., concurring in the judgment) ("If the police wanted to detain an individual for on-site fingerprinting, the intrusion would have to be measured by the standards of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and our other Fourth Amendment cases. . . . It would seem that on-site fingerprinting (apparently undertaken in full view of any passerby) would involve a singular intrusion on the suspect's privacy, an intrusion that would not be justifiable (as was the patdown in *Terry*) as necessary for the officer's protection.").

The most recent example was *Hiibel v Sixth Judicial Dist Court*, 542 US 177, 181-182; 124 S Ct 2451; 159 L Ed 2d 292 (2004), a case concerning an arrest for violation of a state's "stop and identify" statute, which authorized detention of a person to learn their identity and effectively required such persons to identify themselves or be arrested. The

7

majority upheld this statute to the extent that it required vocal identification and held that this was consistent with *Terry*. Despite not being a fingerprinting case, the majority cited and quoted the dicta relating to fingerprints from *Hayes*. The four dissenting justices argued that the Court's decision impermissibly eroded *Terry* and other decisions.

Courts are now split on whether the taking of a fingerprint is a search. Some courts have looked to the Supreme Court's dicta and held or suggested that the taking of fingerprints is not a search. See, e.g., *Palmer v State*, 679 NE2d 887, 891 (Ind, 1997); *United States v Farias-Gonzalez*, 556 F3d 1181, 1188 (CA 11, 2009); *In re Grand Jury Proceedings*, 686 F2d 135, 139 (CA 3, 1982); *United States v Sechrist*, 640 F2d 81, 86 (CA 7, 1981); *United States v Fagan*, 28 MJ 64, 66 (1989). Other courts have either held that fingerprinting is a search or strongly suggested that it is. See *In re Search Warrant No 5165*, 470 F Supp 3d 715, 721 (ED Ky, 2020) (citing *Hayes* to hold that fingerprinting is a search); *In re Search of [Redacted] Washington, DC*, 317 F Supp 3d 523, 531 (D DC, 2018) (citing *Hayes* to hold that "the taking of a fingerprint is undeniably a search"); *In re Search Warrant Application for Cellular Telephone in* United States v Barrera, 415 F Supp 3d 832, 834 (ND Ill, 2019) (holding that fingerprinting is still subject to Fourth Amendment protections); *Paulson v Florida*, 360 F Supp 156, 161 (SD Fla, 1973) (holding that fingerprinting constitutes a search); *United States v Laub Baking Co*, 283 F Supp 217, 222-224 (ND Ohio, 1968) (holding that cases concluding that fingerprinting subsequent to a valid arrest does not offend the Fourth Amendment imply that "fingerprinting does constitute a search" and "fingerprinting subsequent to an unlawful arrest or prior to arrest would constitute an illegal search and seizure"). See also *United States v Askew*, 381 US App DC 415, 454 n 6; 529 F3d 1119 (2008) (Kavanaugh, J., dissenting) ("The

8

Court's . . . decision in *Hayes* plainly considered fingerprinting a search[.]"). In the latter group, the judicial inquiry has generally focused on the reasonableness of the search under the circumstances. Needless to say, the national landscape of Fourth Amendment law in this area is murky at best.

## III. AN INDIVIDUAL'S REASONABLE EXPECTATION OF PRIVACY IN THEIR BIOMETRIC FEATURES MAKES THE TAKING OR COPYING OF FINGERPRINTS FROM THE BODY FOR LATER INVESTIGATION A SEARCH

While I agree with the majority that the taking of fingerprints directly from one's body is a search under *Jones* given the physical trespass that is required under the policy before us, I would also conclude that a search occurred in the absence of the *Jones* line of precedent. More than a century ago, the Supreme Court of Nevada provided an extensive account of the historical development of the science behind using fingerprints to identify individuals in *State v Kuhl*, 42 Nev 185; 175 P 190 (1918). While fingerprint analysis, as a scientific or investigative technique, did not exist at the time the Fourth Amendment was drafted or ratified, it has become a commonplace tool for law enforcement around the world, as both the majority and dissent acknowledged in *King*. The "[c]orrespondence of fingerprints is widely recognized as an accurate means to establish the identity of a person. The same is true with respect to palmprints and footprints. Courts generally will take judicial notice of the general use and accuracy of fingerprint identification." 36 Am Jur Proof of Facts 2d 285, § 1 (April 2022 update) (citations omitted). In fact, many law enforcement agencies maintain databases of fingerprints as a way to help with investigation and the identification of suspected criminals.

9

Without specialized training or advanced analytical software, the details of one's fingerprint structure are neither readily observable nor even very useful. Plaintiffs' brief and the amicus brief filed by the Innocence Network describe in great detail the training and technology that is necessary to make use of a copied fingerprint. In modern times, it is also beyond dispute that a copy of a person's fingerprints is biometric data that can be used for many things beyond individual identification. People regularly use such biometric markers as a security measure for accessing electronic devices (phones and laptops), secured digital spaces (bank accounts, work accounts, and investment accounts), or restricted places (athletic clubs, homes, and vehicles). Without the right biometric marker, one may not be able to gain access. These considerations and the lived experiences of average people strongly suggest that the individualized privacy expectations surrounding one's fingerprints have not only become more robust over time, but also that society widely views such expectations as reasonable.

A copy of one's fingerprints, handprint, or even iris could, quite literally, be used as a key to gain access to that which would otherwise be hidden. It is highly likely that the average person on the street would consider it obtrusive or unreasonable for anyone, much less a government agent, to demand the opportunity to look at one's palms or fingertips with a magnifying glass or to make a copy of the same using ink or a scanner. Such a nonconsensual intrusion into one's personal space or upon their body is offensive to the very notion of individual autonomy and bodily integrity. Moreover, courts should not ignore or minimize the importance of how biometric information can and will be used by government agencies once the information has been harvested and uploaded to a database.

10

Such considerations are relevant to both whether a search occurs and whether it is reasonable under the circumstances.

I view the lifting of fingerprints as being very similar to obtaining a small DNA sample from saliva using a buccal swab, such as what was at issue in *King*, 569 US at 445-446. A DNA sample can also be used to identify an individual as a culprit (although the purpose for the sample in *King* was to link Mr. King to crimes unrelated to why he had been arrested), and such analysis requires technical expertise and the assistance of advanced software. Both the majority and the dissent in *King* agreed that a search had occurred, but they passionately disagreed about whether it was reasonable under the circumstances. And while nothing more than oils and dirt are being physically removed from a person's body when fingerprints are copied, the procedure itself is no less intrusive than a "light touch on the inside of the cheek," the "scraping [of] an arrestee's fingernails to obtain trace evidence," or the production of "alveolar or 'deep lung' breath for chemical analysis." *Id*. at 446 (quotation marks and citation omitted). The Supreme Court's decision in *Kyllo*, 533 US at 34, further suggests that when advanced technology is necessary to observe or analyze the "data" that is being collected, then it is more likely that a Fourth Amendment search has occurred.

Accordingly, I believe that the Supreme Court's decisions in *King* and *Kyllo*, which were premised on the "reasonable expectation of privacy" line of precedent, compel the conclusion that the lifting of one's fingerprints from a person's body is a search for Fourth Amendment purposes. Even *Hayes* suggests that the lifting of fingerprints is a search while simultaneously suggesting that its minimally invasive nature may make the search reasonable in more circumstances than not. At least one court's actions support the idea

11

that seeking biometric information to access digital devices is a search under the Fourth Amendment, thus requiring a search warrant. See *In re Search of [Redacted] Washington, DC*, 317 F Supp 3d at 532-533 (establishing a multipart standard that law enforcement must meet for a search warrant to preauthorize law enforcement to compel someone to use an "individual's biometric features" to unlock an electronic device). See also *Riley*, 573 US at 386.

There is also an important distinction between taking copies of someone's biometric data from their body and obtaining the same information from a public space. "[F]ingerprints are deposited in public places, but their detailed structure is not common knowledge." Kaye, *The Constitutionality of DNA Sampling on Arrest*, 10 Cornell J L & Pub Pol'y 455, 475 (2001). The mere fact that a person deposits fingerprints in a public space should not eliminate the privacy interest that person has in their body any more than spitting on the street eliminates the privacy interests that make a buccal swab a Fourth Amendment search.[2]

The compelled production of voice exemplars in *Dionisio*, 410 US at 14, is easily distinguishable. When a person speaks, anyone within earshot can listen to the words that are said as well as the tone and pitch of the person's voice. The individualized privacy expectation in the details of one's voice are minimal because voices are regularly exposed

---

[2] I acknowledge that once people abandon greasy impressions of their fingerprints in a public space, such as on garbage that has been thrown away or on a door knob, then the public-exposure doctrine would likely allow law enforcement to obtain copies of such *abandoned* biometric information without triggering the Fourth Amendment. See *Horton v California*, 496 US 128, 141-142; 110 S Ct 2301; 110 L Ed 2d 112 (1990); *California v Greenwood*, 486 US 35, 39; 108 S Ct 1625; 100 L Ed 2d 30 (1988).

to the public in a way that others can understand and use the information gleaned from hearing the voice. A judge or juror has no need for advanced technology or training to listen to multiple voice recordings and decide whether he or she believes that the voice heard on the recordings is the same person. Obviously, such determinations could be enhanced by technology, but it is not necessary. A leading criminal-law treatise has drawn a similar analogy concerning hair. "[W]hile the hair is 'constantly exposed' in the sense that the person knowingly exposes the color and style of his hair, it cannot really be said that the hair is exposed in the sense of revealing those characteristics that can be determined only by microscopic examination." 1 LaFave, Search & Seizure, § 2.6(a) (6th ed) (December 2021 update). It is well understood that a government agent cannot compel a person to turn over a sample of their hair or the scrapings under their fingernails without adequate justification because doing so would be a search of the person. See *Cupp v Murphy*, 412 US 291; 93 S Ct 2000; 36 L Ed 2d 900 (1973). Like a hair sample or fingernail scrapings, some form of advanced examination, likely involving a trained expert using sense-enhancing technology or computers, is necessary to make a fingerprint useful to law enforcement or fact-finders.

Thus, I believe there is strong legal support for the notion that the collection of biometric information, like fingerprints, from a person's body is a search under the Fourth Amendment and that the focus of judicial review should include an analysis of the reasonableness of the search under the circumstances. There might soon be a time when we are called upon to determine the constitutionality of a nontouching/nontrespassory harvesting of biometric information for investigative purposes prior to arrest. Changing

13

technologies require an evolving lens through which our search and seizure jurisprudence should be viewed.  I respectfully concur.

Elizabeth M. Welch
Bridget M. McCormack
Megan K. Cavanagh
